# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01542-COA

KIM STEWART                                                    APPELLANT

v.

GREG STEWART                                                    APPELLEE

DATE OF JUDGMENT:              09/05/2018
TRIAL JUDGE:                   HON. M. RONALD DOLEAC
COURT FROM WHICH APPEALED:     PERRY COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        JONATHAN MICHAEL FARRIS
ATTORNEY FOR APPELLEE:         SHAWN M. LOWREY
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED - 11/17/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### CARLTON, P.J., FOR THE COURT:

¶1.     Greg Stewart and Kim Stewart (n/k/a Stinson) were divorced on December 29, 2015, under a divorce decree entered in the Perry County Chancery Court. Kim was granted physical custody of the parties' two minor girls, with Greg having visitation and the parties sharing legal custody of the girls. Less than eight months later, Greg filed a complaint for custody modification seeking sole physical custody of the girls. On September 5, 2018, the chancery court entered its "Opinion and Final Judgment," granting Greg sole physical custody of the girls, with Kim having visitation rights and the parties sharing legal custody of the girls. In the same final judgment, the chancery court also (i) ordered Kim to pay 70% and Greg to pay 30% of the remaining guardian ad litem (GAL) fees; (ii) granted Greg's

"Motion for Contempt and Sanctions," ordering Kim to pay reasonable attorney's fees relating to that motion; and (iii) ordered Kim to pay Greg $5,330 in attorney's fees and court costs under Mississippi Code Annotated section 93-5-24(9)(c) (Rev. 2018) for her unfounded allegations against Greg.

¶2.	Kim appealed.[1] For the reasons addressed below, we affirm the chancery court's final judgment in all respects.

¶3.	Greg filed a "Motion for Appeal Fee" under Mississippi Rule of Appellate Procedure 27(a). We deny Greg's motion without prejudice to his right to refile his request prior to the issuance of the mandate in a motion that complies with Rule 27(a) and the requirements of *Latham v. Latham*, 261 So. 3d 1110 (Miss. 2019).

## PROCEDURAL HISTORY AND FACTS

### I.	Pre-trial Proceedings

¶4.	Greg and Kim were divorced on December 29, 2015, pursuant to a divorce decree entered in the Chancery Court of Perry County, Mississippi. In that judgment, Kim was granted physical custody of the parties' children, Laura,[2] a girl born in October 2003, and

---

[1] Before this case was assigned to the Mississippi Court of Appeals, the parties filed motions relating to the timeliness and length of the appellant's brief. In the course of ruling on these motions, the Mississippi Supreme Court allowed the filing of the appellant's brief, which was 128 pages in length and contained twenty-eight assignments of error. Indicative of the lengthy factual history and proceedings below, the chancery court's judgment consisted of seventy-four pages. Following assignment of this case to the Mississippi Court of Appeals, this Court addresses each of the twenty-eight assignments of error that were permitted in this appeal.

[2] Pseudonyms are used for the minor children.

2

Hannah, a girl born in November 2006. Greg is Laura's adoptive father and Hannah's natural father. Greg was granted visitation, and both parties were granted legal custody of the girls.

¶5.    This appeal concerns Greg's subsequently filed "Complaint for [Child Custody] Modification and Temporary Relief" that the chancery court granted on September 5, 2018, as well as sanctions imposed against Kim in that same final judgment. Below is the procedural history and facts relating to the issues on appeal. To avoid repetition, additional facts and circumstances relating to the Kim's assignments of error will be discussed as these points are addressed in the discussion section of this opinion.

¶6.    Less than two months after the divorce was granted, litigation ensued concerning the children. In late January 2016, Laura and Hannah were at Greg's home for visitation. There was an altercation between Greg and Laura that resulted in Laura calling 911. When Greg understood that Laura was on a 911 call, he took the phone and spoke to the dispatcher. Greg explained that he and his daughter had a conflict but that everything was fine, and there was no need to send an officer. No officer was sent.

¶7.    When Kim learned of this conflict, she did not require Laura to go to visitation with Greg, but she allowed Hannah to go. These circumstances led to Greg filing a motion for contempt on February 23, 2016, due to Kim's non-compliance with the court-ordered visitation. Three days later, Kim filed a "Motion to Hold Visitation with Specific Child ([Laura]) in Abeyance." In this motion, Kim also requested that the chancery court "appoint

3

a special expert[] to determine when and if visitation should resume."

¶8.     The chancery court held a hearing on March 2, 2016, concerning these motions and other motions not at issue in this appeal.  Shannon Rainey, a Licensed Professional Counsel or LPC, testified at the hearing at Greg's request.  She testified about her professional relationship with the parties, having counseled Kim and the girls since 2014 and Greg beginning after the divorce trial, both individually and with Laura.  Rainey also testified that Kim did not attend a joint session that she had been invited to take part in.

¶9.     Regarding the 911 incident, Rainey testified that she had not had a counseling session with Laura since that event occurred.  Kim's counsel requested on the record that Rainey "talk to her [Laura] and report back to the court" regarding the 911 incident.

¶10.    Greg testified about the 911 incident, stating that he told Laura to brush her hair and teeth before she went out and that she responded, "No. I'm 12 years old. I'm old enough to know when I need to brush my teeth and brush my hair."  Greg said he told her, "You are going to do it now or you're not going outside."  According to Greg, Laura "flopped down" and got her shoes and was putting them on.   He told her, "No," and "got her by the arm and walked her [into her bedroom]."  He testified that he then told her, "You are going to do what I told you," and she got her cell phone and called 911.  Greg further testified that he was not allowed to have Laura on his scheduled visitation on two weekends.  Kim did not produce any evidence of bruises or any type of injury to Laura with respect to the 911 incident.

¶11.    At the end of the hearing the chancery court ordered that Kim, Greg, and both minor

4

children continue in family counseling with Rainey; the court ordered that Rainey was to investigate "the circumstances and events surrounding the [911] call," and report to the chancery court her findings and recommendations. This was done with Rainey's agreement and the agreement of counsel. The chancery court memorialized this bench ruling in its "Order for Family Counseling" entered on March 14, 2016. In that order the chancery court also ordered that "all parties are . . . to fully cooperate and participate in the counseling as directed by the counselor."

¶12. Further, after hearing Rainey's testimony and the testimonies of Kim and Greg, the chancery court held that "the evidence presented establishes that [Greg's] actions with [Laura] were parental discipline as opposed to any kind of abuse or injury or harm, [and therefore] the [c]ourt is going to find that [Greg] has prevailed on his motion for contempt, and the [c]ourt is going to cite [Kim] for contempt for denying [Greg] his two weekends of visitation with [Laura]."

¶13. Rainey held a counseling session with Kim and Greg on March 26, 2016, and held a counseling session with Laura on April 12, 2016, pursuant to the court's order. On May 9, 2016, Rainey submitted her report to the chancery court, which was distributed to counsel and the GAL. Rainey's report contained a summary of her April 12, 2016 session with Laura and was admitted at trial as Exhibit 16, and her progress notes regarding that session were admitted at trial as Exhibit 18. Rainey summarized the circumstances surrounding the 911 call as follows:

5

[Laura] reported that she called 911 on [her father] because he tried to get her to brush her teeth. I asked her to tell me more about that incident and she described it in detail. She reported they were going to go somewhere and Greg asked her to brush her teeth and her hair. She told him she did, . . . [and then] told him she wasn't going to do it again. She reported that Greg grabbed her by the arm and pushed her into her room (bedroom). She stated they get sent to their room as a form a punishment. When he pushed her by her arm she stated that she fell onto the floor. I asked if she had bruises, cuts, etc and she replied, "No ma'am." She stated that he then shut her door and she found her cell phone and called 911. I asked what made her call 911? She reported that her grandfather and grandmother had always taught them to call 911 if they were ever in trouble. She also stated that her mom told them to do the same when she dropped them off for weekend visitation with her dad. She reported that Greg came into the room and took her phone outside and talked to the police. Once the incident was over she said her dad told her he was disappointed in her. That was the end of the "controversy" according to [Laura].

¶14. Rainey's recommendation, as set forth in her report, was as follows:

I feel that this was not an incident that warranted calling the police. There appeared to be no abusive interaction. The child reports that Greg did not hit or place his hands on her other than to put her in her room. I believe that [Laura] is extremely emotional around interaction with her father, therefore she "experienced" something that was much worse than it really was.

I continue to recommend that the father and the child attend therapy to work through the issues that are keeping the child angry. I also recommend that Kim receive therapy around [sic] allowing the child to have a relationship with the father. Kim avoids interaction with Greg in my presence and the child imitates that behavior.

¶15. The day after receiving Rainey's report and recommendation, the chancery court entered its order denying Kim's motion to hold Laura's visitation with Greg in abeyance and granting Greg's motion for contempt. The chancery court further ordered family counseling to continue with Rainey.

6

¶16. Less than two weeks later, after having received Rainey's report, Kim filed a motion to amend the chancery court's May 10, 2016 order, seeking to have Rainey removed as the court-appointed counselor. Kim asserted that Rainey's alleged "lack of professional objectivity has affected Ms. Rainey's professional judgment and lessened her effectiveness in attempting to aid these parties in reaching a resolution to the issues they are currently facing as a family." Kim admitted in her motion that she had recorded the March 26, 2016 session that she and Greg had with Rainey, and Kim also admitted recording Laura's April 12, 2016 session with Rainey by placing a recorder in Laura's purse (unbeknownst to Laura). The transcripts from these recordings were attached to Kim's motion and were admitted as exhibits at trial.

¶17. Greg responded to Kim's motion and also moved for sanctions on June 1, 2016, alleging that by recording the session between Laura and Rainey, Kim had interfered with the chancery court's order and, further, "breached the trust between the counselor and the minor child as well as continued the destruction of the child's relationship with her father."

¶18. The chancery court convened a hearing on June 27, 2016, to address these motions and others filed by the parties. At that hearing, the chancery court told the parties that he had received a letter from Rainey in late May in which Rainey explained that after having received Kim's motion, she felt compelled to recuse herself from any further counseling efforts with respect to the minor children or their parents. The chancery court shared that letter with counsel for the parties.

¶19. In her recusal letter, Rainey observed that Kim's motion was supported by session transcripts from recordings that were made without Rainey's knowledge and that the allegations in Kim's motion were "fallible" and out-of-context. Rainey further stated in her letter that she felt that Kim "undermined" and "made a mockery" of the therapeutic process. Rainey said that in her professional opinion, Kim was not serious in helping her minor children develop an appropriate relationship with Greg and that she was a detriment to the reconciliation process. The chancery court "regretfully" accepted Rainey's recusal.

¶20. The chancery court also stated on the record that in accordance with discussions in his chambers with counsel, he was appointing Deborah Carr, an LPC and also a member of the bar, as the family counselor. Orders memorializing these rulings (accepting Rainey's recusal and appointing Carr as the new counselor) were entered on July 6, 2016. All other relief relating to the parties' outstanding motions to amend the divorce judgment was denied, as they were based upon evidence and circumstances occurring post-divorce. As to this point, the parties were granted leave to file any additional pleadings as they may deem necessary in light of the Court's ruling.

¶21. On July 12, 2016, the chancery court appointed Cynthia Re as the GAL of the minor children. In that order the chancery court specifically recognized that she is "an attorney licensed to practice law in Mississippi and . . . has received the requisite training and is duly certified to serve as [a GAL] for the best interests of the minor children in this case." The chancery court further "specifically recognize[d] that the [GAL] shall be designated as an

8

expert witness under [Mississippi Rule of Evidence]" and pursuant to Mississippi law. The order also provided that any objections to Cynthia Re as an expert and that any challenges to her qualifications were required to be filed within ten days of entry of the order.

¶22. On July 14, 2016, Greg filed his "Complaint for Modification and Temporary Relief" against Kim, seeking "permanent primary [physical] custody" of both girls and for Kim to have supervised visitation. Greg alleged material changes since the entry of the last judgment that were detrimental to the children's welfare, including allegations regarding Kim's misconduct and interference with the family's court-appointed counselor, Shannon Rainey; Kim cultivating animosity in Laura toward Greg; and Hannah having failed the third grade after Kim removed the child from a nonpublic "3-D" school and enrolled her in a public school. Kim filed her answer to Greg's complaint, denying Greg's allegations and raising, among other defenses, that Greg's complaint was barred by the doctrine of unclean hands.

¶23. The chancery court held a temporary hearing on August 8 and 9, 2016, to address Hannah's school issues. On August 31, 2016, the chancery court entered its "Temporary Order of August 9, 2016" finding that Hannah was to attend the 3-D school, with Greg to pay the expenses associated with her attendance, and that Greg was to transport Hannah to and from the school. The chancery court also ordered that "should either parent miss or cancel any counseling sessions with the Court-appointed counselor (Debra Carr), the Guardian ad Litem is to be notified by that parent as to the cancellation and the reason, and that the Court would expect documented evidence of an excuse as to why the appointment was missed."

9

ADHD and ADD testing was also ordered for Hannah.

¶24. On Greg's motion and after a hearing, the chancery court entered an "Order for Psychiatric Evaluation" on December 19, 2016, ordering each party to submit to an evaluation by Dr. Geralyn Datz. Dr. Datz performed a "Psychological Interview & Testing Evaluation" (psychological evaluation) for Greg and Kim, and these reports were admitted into evidence at trial.

¶25. The Summary of Greg's psychological evaluation provides:

> Mr. Stewart appears a credible claimant and psychological testing shows he did not attempt to exaggerate or minimize his reports of events or of his current psychological state. He reports being in no current psychological distress and this is corroborated by testing and clinical impression. His wife is currently accusing him of physical and emotional abuse. This an issue for the court to decide on. There were no records, police or medical or otherwise, that were provided to me, or that exist, according to both Mr. Stewart and his wife that "prove" he has been abusive.

¶26. The summary of Kim's psychological evaluation provides:

> Ms. Stewart presents in no apparent distress. She has an unusual clinical presentation for someone who alleges abuse and high degree of a distressed relationship. This is not to say her report is not without merit, but her presentation as . . . joking[] and laughing is incongruent in my experience with someone who is genuinely in fear of a spouse or significant other, either in person or in influence on their children.

> Clinical interview revealed multiple inconsistencies in Ms. Stewart's report of events, and there was also incongruity with medical records . . . . At least three treating providers (Dr. Calloway, Ms. Shannon Rainey and Debra Carr) have reportedly opined that she would benefit from psychotropic medication. In addition, Ms. Wilkes has diagnosed her with depression and anxiety within the last 6 months. Ms. Stewart is very minimizing or dismissive of these recommendations today.

10

Ms. Stewart does not appear to meet any criteria of a major clinical disorder at this time, but if allegations of her past behaviors are true, she may meet criteria for a personality disorder. . . . I did not have enough interaction with Ms. Stewart to fully explore these issues. However, there are pieces of data that suggest that personality or at least boundary issues may be present. Namely, the egregious behaviors of taping of a confidential psychotherapy session/exposing confidential information, contempt of court allegations and a tendency toward self serving/victimhood explanations, and voicing concerns about the divorce with the children, and attempting to use children to report back to her about her husband's behavior, and process concerns with the children, would be considered at best as poor judgment, and at worst as indicative of maladaptive, long[-]standing personality characteristics.

¶27. On December 22, 2016, Kim filed a "Defendant's Emergency Motion to Temporarily Suspend Visitation." Kim asserted that when Laura and Hannah were with Greg for Christmas visitation, the children contacted her. Laura complained of a headache, and ultimately the decision was made to take Laura to the doctor. Both parties attended the doctor visit. Kim alleged that while at the doctor, Laura spoke to the doctor alone and reported abuse by Greg. Kim asserted that the doctor had reported suspected abuse to the then Mississippi Department of Human Services (DHS) (now Mississippi Department of Child Protection Services (CPS)), which had begun an investigation. Kim sought to have Greg's visitation with the children suspended until trial.

¶28. Greg filed a "Motion for Attorney Fees" pursuant to Mississippi Code Annotated section 93-5-24(9)(c) on January 18, 2017, seeking attorney's fees if the allegations Kim raised in her "Emergency Motion to Temporarily Suspend Visitation" were determined to be unfounded. Shortly thereafter, on January 31, Greg filed his third motion for contempt, alleging that Kim refused to abide by the chancery court's judgment by deliberately

11

withholding the children on January 27-29. Greg sought an immediate change of custody and attorney's fees.

¶29. Kim filed a motion to dismiss and a motion for sanctions on February 1, 2017, asserting that Greg's third contempt motion should be dismissed for insufficient service of process and that sanctions should be awarded because Greg's motion was frivolous and contained material misrepresentations, arguing it was only Laura who did not go to visitation. Kim attached to her motion copies of communications between the parties (and furnished them to Greg's counsel) in which "[Greg] was notified that the minor child, [Laura], was emotionally exhausted from the examinations ordered by [CPS] . . . and physically ill to her stomach," and in which Kim requested permission to keep Laura with her that night.

¶30. The chancery court held a two-day hearing on these motions on February 8 and 9, 2017. After hearing the testimony of both parties, Chelsiah Butler of CPS, Billy Strahan (Kim's father), and the GAL, Cynthia Re, the chancery court entered an order on these motions on February 13, 2017. The chancery court denied Kim's "Emergency Motion to Suspend Visitation" and placed "primary" physical custody of the children with Billy Strahan (the maternal grandfather) and his wife, Brenda, with each parent being allowed visitation on alternating weekends. The chancery court ordered that Kim's visitation was to be exercised under the supervision of the Strahans. In making this determination, the chancery court found as follows:

> As to [Greg's] Motion For Change of Custody as found in his Motion for Contempt filed on January 31, 2017, the Court finds that the current

arrangement, with the children in [Kim's custody], is not in the best interest of the children at this time. The Court notes that since the parties' divorce, [Laura] has on numerous occasions, exhibited behaviors that indicate that she has suffered such an amount of mental anguish as to take a serious toll on her mental health. Such was corroborated by the testimony of the parties and the Guardian ad Litem, and the Court deems this to constitute a material change in circumstances to the extent such a finding is necessary for the purposes of a change of temporary custody and/or visitation and that said change obviously has had an adverse affect on [Laura]. The Court also finds that the majority of [Laura's] mental anguish has in one way or another originated with the Defendant's actions. . . . [Greg] admitted, however, that presently his relationship with [Laura] is strained to say the least, and thus to have the children come live with him would not necessarily be in their best interest at the moment, but said he would like an opportunity to repair the relationship to the point that such a change could be considered. It is clear to the Court that [Greg] and [Laura] will not be able to repair their relationship at this time as long as [Laura] is residing with [Kim].

The chancery court then stated its reasons for placing the children with the Strahans and delineated the parties' visitation guidelines.

¶31.    Regarding the DHS/CPS investigation, the chancery court found as follows:

[Chelsiah] Butler with CPS testified as to the ongoing DHS/CPS investigation and the forensic interview of [Laura] and the subsequent forensic medical examination of both girls at the Children's Safe Center in Jackson. . . . The investigation as to the abuse allegations made by [Laura] and reported to DHS/CPS by The Family Practice Clinic on December 17, 2016 . . . is ongoing. Ms. Butler's testimony was inconclusive as she testified no finding has been made by CPS at the time of hearing. The Court agrees with the testimony of the GAL that the abuse allegations reported to The Family Practice Clinic by [Laura] are the same allegations as those heard and adjudicated in prior proceedings and addressed by the Court in the Order and Judgment on Post-Trial Motions filed May 10, 2016 . . . . Those concerns and issues were also addressed by the Court in its Bench Ruling on March 2, 2016.

While [Kim] testified about her concerns for the girls when they are with their father, [Greg] flatly and without reservation denied that he has ever physically abused either child notwithstanding that the temporary suspension request of

13

his visitation goes only to [Laura] and not [Hannah]. The GAL in her testimony corroborated [Greg's] testimony by stating that [Laura] told the GAL she had never been spanked by her dad although she had been spanked by her mom. The Court also finds compelling the GAL's testimony that [Laura] is defiant as a 13 year old. The Court cannot and will not be bound by the child's displeasure and desire not to spend time with her father absent abuse or neglect on his part. The children are suffering because of the ongoing disagreements of the parents concerning them.

¶32.    Pursuant to section 93-5-24(9)(c), the chancery court ordered Kim to pay $3,022.50 in attorney's fees to Greg because it found Kim's allegations in her "Emergency Motion to Suspend Visitation" to be unfounded.

¶33.    Greg filed a "Motion to Modify Temporary Order" on June 19, 2017.  In that motion, Greg asserted that his relationship with Laura greatly improved until summer visitation, when Kim again had unfettered access to Laura. Greg requested that the chancery court continue its previous order of supervised visitation for Kim and award him "primary" custody of both children.  Kim filed a response on July 18, 2017, denying Greg's allegations and asserting that there was no basis to modify the temporary order. The matter was set for hearing on July 19, 2017.  Prior to starting the hearing, the parties conferred with the chancery court and then entered into an agreed temporary order that Kim and Greg would share temporary joint legal and joint physical custody of the children until further order of the chancery court. Each parent would have custody of both children on alternating weeks.  This arrangement took place from July 23, 2017, through December 2018.  The parties' agreed temporary order was entered, nunc pro tunc, on November 2, 2017.

¶34.    In October 2017, shortly before trial began, a CPS investigation was initiated based

14

on a report from Laura's school (the same school where Kim worked) that Greg allegedly was not properly feeding Laura, neglected her, and emotionally abused her. Two teachers from Laura's school were brought in as witnesses at trial, as well as Gabrielle Tripp, the CPS investigator on this case. At trial, the CPS report was admitted into evidence. Both Tripp's testimony and the CPS report showed that the allegations were unsubstantiated.

¶35. The GAL's confidential preliminary report was filed under seal on October 30, 2017, and admitted into evidence at trial as Exhibit 21.

¶36. The case was tried on November 1, 2, 9, and December 14, 2017. The trial record remained open to admit Rainey's deposition testimony, the first court-appointed family counselor. Final record proceedings from trial occurred on April 17, 2018. At that time, the chancery court gave counsel the opportunity to re-call their clients for further testimony after Rainey's deposition testimony, and exhibits to that deposition were admitted into evidence under seal. Neither party elected to testify.

## II. The Trial

¶37. At trial, the Court heard testimony from Debra Carr, the current family counselor; Gabrielle Tripp with CPS; Greg; Judy Lanyon and Ashley Andrews (teachers from Laura's school); Kim; Billy Strahan (Kim's father); Jamie Earl Stinson (Kim's husband); the GAL, Cynthia Re; and former family counselor Shannon Rainey by deposition.

¶38. Debra Carr, the second court-appointed counselor, was the first witness to testify. She testified that Hannah was "blooming" now that she was back at the 3-D school. Regarding

15

Laura, Carr testified that the relationship between Laura and Greg had been "bitter," but that it had gotten better when the girls were with the Strahans. However, later, without Kim's parents involved, Laura's relationship with Greg had deteriorated. She testified that Kim appeared to be "overwrought" with her relationship with the girls, particularly Laura, and that she believed that Kim's determination to be the parent was a possible obstacle to Laura's relationship with Greg. Carr described how Kim's hostility toward Greg was communicated to Laura and influenced Laura in her relationship with Greg. Carr testified that she was concerned how the emotional impact on Laura would affect Hannah and described a recent session in which Laura turned on Hannah when she would not support Laura's version of events that had happened in a prior session. Carr further testified that in order for things to improve in the family, everyone must be "on board" but that Kim consistently viewed Greg and the family's circumstances in a negative light. In Carr's opinion, Laura appeared to be repeating the same perceived instances of neglect or abuse: "It is basically the same events that she repeats. The story shifts off and on, and every time she repeats them," without giving details as to when it happened. Carr testified that she was very concerned by the time of the trial as to Laura's bitterness and distress and believed that she needed assessment at a facility called Brentwood. During Carr's testimony, the chancery court ruled that it would not entertain a custody recommendation from Carr, as she was not appointed for that purpose. She recommended against separating the girls. Carr testified that Kim had thus far never said anything to her that was positive about Greg.

16

¶39. Greg's next witness was CPS investigator Gabrielle Tripp, who had investigated the recent October 2017 report to CPS about Laura's neglect and emotional abuse allegations to teachers at her school, Oak Grove Middle School (Oak Grove). Tripp's report was admitted into evidence at trial. She testified that after an investigation, the claim was deemed unsubstantiated, and the case had been closed. This information is likewise reflected in the CPS report.

¶40. Greg was the next witness to testify.[3] He testified that he wanted sole custody because he believed that Kim interferes with his relationship with Laura; she accuses him of abusing Laura in front of the girls; and he knows that Laura listens to the things Kim says about him because Laura repeats it back to him. He believed Laura is being taught by Kim to be disrespectful toward him. Greg testified that when the Strahans had the girls and the restriction on Kim's visitation was enforced, there were no problems with the visitation. She attended her visitation, and the relationship between the Greg and Laura improved. However, when the joint custody arrangement began, Laura was like "two different children," and her behavior toward her father diminished. He further testified that when the case started and Rainey was the counselor, he believed that he was making real headway at improving his relationship with Laura. When the issue of Kim recording the sessions came up and Rainey was no longer their counselor, this caused his relationship with Laura to go

---

[3] Prior to Greg testifying, Kim sought to admit into evidence Laura's and Hannah's forensic interviews taken in January 2017 at the Kids Hub Child Advocacy Center. We discuss this issue below.

17

"back to zero," and they had to start again with Carr.

¶41.    Greg rested his case. Kim moved for a directed verdict on Greg's complaint, which the chancery court denied. Kim also moved to dismiss Greg's motion for sanctions, asserting that he failed to meet his burden of proof as to that motion. The chancery court postponed its decision on that motion.

¶42.    Judy Lanyon and Ashley Andrews were Kim's first two witnesses. Both taught at Laura's school, Oak Grove, where Kim was also a teacher. Judy Lanyon was one of Laura's eighth-grade teachers. She testified that Laura did well at school interacting with other students and was making good grades. She testified that Laura is involved in extra-curricular activities, including band and robotics. She testified that Laura confided in her, accusing Greg of neglect or abuse. Lanyon reported this to the school counselor as required. She was contacted by CPS. Lanyon said she talked to Kim for a "few seconds" about CPS talking to her (Lanyon). According to Lanyon, Kim really did not say a whole lot about it because they were in class, and they just dropped the subject.

¶43.    Ashley Andrews testified that she would see Laura in the hallways at school. She responded, "Yeah," when asked, "Has [Laura] ever told you she was neglected or abused?" Andrews also testified that she was in a meeting at school when abuse allegations about Laura were raised. This meeting happened about three weeks before trial started. Andrews also testified that she told Kim about the conversation she had with Laura about her abuse allegations, and Kim knew what they [Andrews and Laura] had talked about. She testified

18

that Kim was not supportive of Greg.

¶44.    Kim then testified. She testified generally about her employment as a teacher at Oak Grove Middle School, her health, and home life with her new husband, Jamie Stinson, his three children, and her girls.

¶45.    Kim testified that the relationship between Greg and Laura post-divorce was "strained," and when asked about counseling progress with Rainey, Kim testified that no progress was made post-divorce when Greg joined the sessions. She further testified that she and Rainey had no conflicts prior to March 26, 2016, when she recorded that session between Kim and Greg. She did so "based on [her] concerns of Shannon Rainey's records and documentation." She testified that both Greg and Rainey were aware she was recording the session. Kim claimed that Rainey was biased against her.

¶46.    Regarding the April 12, 2016 session between Laura and Rainey that Kim recorded, Kim testified that Laura did not know that Kim put a tape recorder in Laura's carrier for that session. Kim did not tell Laura so that Laura would not feel awkward. Kim testified that she did so because she feared that Rainey's summary of the session would not be accurate. She further testified that there was no court order that said she could not record the counseling sessions. According to Kim, when she saw Rainey's report on the session, she found that it was inconsistent with the tape from the session. Kim said her authority to tape the session secretly was "I'm her mother." She stressed that Dr. Lowe (and not she) reported to DHS/CPS in December 2016 what Laura reported about Greg and abuse. Kim also testified

19

that Laura had been guilty of telling stories. She said she had never called DHS to complain about Greg. Kim agreed that Hannah was doing well at the 3-D school and with her ADD medications. She claimed that Laura and Greg were still working on their difficulties under the week-to-week temporary custody order. She said she had encouraged Laura with her relationship with her dad. She further testified that all was going well with the week-to-week arrangement and that she and Greg communicated.

¶47. Kim testified that Laura was the one who made the school complaint about Greg's abuse. She said she did not wish to take the girls away from Greg. She agreed that Laura should be evaluated and claimed she did not interfere with Rainey as a family counselor. Kim objected to Greg's having custody and said if that happened, Laura would run away. Kim denied alienating the child from Greg. She said Laura did not respond well to her when she would encourage the child regarding her relationship with Greg. Kim admitted she shared in the responsibility for the problems she and Greg have had as to Laura. She said there had not really been any conflicts with Greg since July 2017, when they began the joint custody arrangement.

¶48. On cross-examination, Kim said Rainey became biased against her just prior to the March 26, 2016 counseling session. According to Kim, Rainey was upset with her because she had taken Laura to another counselor at a facility called Connections in Hattiesburg. She was not aware that Rainey reported that Laura had told Rainey that Kim told Laura negative things about Greg, as set forth in Rainey's counseling session record from January 15, 2016.

20

She denied Rainey told her to stop telling Laura negative things about Greg, as set forth in Rainey's January 19, 2016 counseling-session record.

¶49. Kim admitted that Laura "at this point" was untrustworthy about abuse or neglect claims relating to Greg:

> [COUNSEL FOR GREG:] Can you tell me which one of these things is more true? Greg Stewart is a neglectful and abusive father or [Laura] is an untrustworthy witness.
>
> [KIM:] Right now I would . . . feel that . . . [Laura] . . . would be more untrustworthy at this point.

Kim said she had had no issues to discuss with the GAL in the past few months, and that was why she had not contacted her.

¶50. Billy Strahan, Kim's father, also testified at trial. According to Strahan, there had been no improvement in the strained relations between Laura and her dad. There was still tension between them. He affirmed that Hannah's ADD medicines have helped her. He said there have been no problems with visitation returns. He testified Greg's demeanor was bad during the time the Strahans had temporary custody, but he had no problems with Kim. He had not observed any animosity by Kim against Greg. He said that Kim disciplined Laura in the past when she refused to go to visitation with her dad. He agreed Greg's relationship with Hannah was good. He said he has observed the girls get along well with Jamie Stinson, Kim's new husband.

¶51. Regarding custody, Strahan testified that Greg should not have sole physical custody

21

of the girls because most men cannot take care of two girls; Laura would be unhappy; and that unhappiness would "rub off" on Hannah. He affirmed that the girls have a strong relationship with each other. He said joint physical custody is a bad idea, and Kim should have physical custody of the girls. He testified about Kim's parenting skills, work schedule, ability to meet medical needs for both girls, and the emotional bond between Kim and the girls.

¶52. On cross-examination, Strahan said that since July 2017 "we" have followed the Court's orders for visitation. He then said he attended Hannah's birthday party and did not know Greg was supposed to have four hours of visitation time with Hannah on her birthday. He also said that "from what he understood," Laura did not go for visitation and custody time with Greg the week before Strahan testified. On re-direct, Strahan testified that Kim did not intentionally withhold Laura from custody time with Greg and that he was not aware of Kim initiating any CPS investigation.

¶53. As noted, Jamie Stinson is Kim's new husband. He testified about their family relationships and said he and Kim had dated since February 2016 before they got married on October 6, 2017. He had occasionally been present at exchanges for the girls to go with Greg and said Laura would be upset and did not want to go with Greg, but they encouraged her to do so. He testified that Kim punished Laura when she refuses to visit with Greg. He admitted that Laura refused visitation with Greg after Thanksgiving and said that Kim told Laura to ask Greg if she could stay with Kim. The same thing happened a second time when

22

Laura refused and Greg tried to get her out of the car and then agreed to let her go with Kim. Jamie testified that he did not know Greg was supposed to have time with Hannah on her birthday. He said he had not observed Kim promoting animosity toward Greg with Laura. He felt that the joint custody week-to-week arrangement should remain in place.

¶54.    In rebuttal, Greg testified that Kim refused his request to visit with Hannah on her birthday.  He said that on Laura's birthday, he took her to the Strahans' house so Kim could have her time with her.  Greg testified that there were no problems when the girls were at the Strahans' house under that temporary order.  Regarding two recent missed visitations (post-Thanksgiving 2017), Greg testified that he agreed one time that Laura would not come with him as he and Hannah were going hunting.  The second time he did not agree that Laura would not come with him for visitation but he testified that was not going to physically pull the child out of the car nor did he expect Kim or Jamie to pull her out of the car.

¶55.    The GAL, Cynthia Re, testified as the last witness at trial.  To avoid repetition, her testimony, and any objections relating to that testimony, is addressed below in our discussion of the chancery court's custody analysis and relating to points Kim raises on appeal regarding Cynthia Re and her appointment.  The GAL's preliminary report was admitted into evidence as Exhibit 21.

¶56.    Rainey's trial deposition was admitted into evidence under seal.  As noted, Rainey was the chancery court's first appointed family counselor.  Rainey was an LPC with twenty years of family-counseling experience.  She had a bachelor's degree in psychology and a master's

23

degree in counselor education with an emphasis in community counseling. She testified that she began counseling Kim and the children in 2014 (over two years prior to her appointment to continue family counseling). At Greg's request after the divorce trial, Rainey also began counseling Greg, individually, and with Laura.

¶57. Rainey testified that she has been accepted as an expert "multiple times" over the past years in cases involving children and mental illness and as an expert in family counseling. She testified that the chancery court in this case appointed her as the family counselor. Rainey testified that she was accepted as an expert in the Forrest County court system in "multiple situations."

¶58. Rainey testified that once Greg came to see her, they began working on building and developing a better relationship between Greg and the children. In the process, she saw that Kim's allegations against Greg were not true, and, at that point, Kim began resisting continued family counseling. Rainey's relationship with Kim began to deteriorate as Greg's relationship with the girls improved. Rainey testified that once she began working with the children on having a better relationship with Greg, it became clear to her that this was really not what Kim was wanting. Rainey further testified that although Kim initially asked her to begin trying to work with Greg to "make him a better father," when these things actually happened, Kim told Rainey that it was too late, and she didn't want that anymore. Kim would not allow Laura and Greg to meet with Rainey without her (Kim) being present. Later in her deposition, Rainey testified that after she suggested that both parties have a good

24

relationship with the children and that Greg have time with the children, she found that Kim was not willing to work with her in helping the children develop a relationship with Greg.

¶59. Rainey also testified that her report and recommendation to the chancery court about the 911 incident, which was admitted into evidence, was "what [she] observed[, and] it was [her] professional recommendation." Among other observations and recommendations, Rainey's report provided that "Kim avoids interaction with Greg in my presence and the child imitates that behavior." Rainey testified that she stood by her report and recommendations to date based upon the information available to her at the time of the report. Rainey also testified Kim's recordings of the counseling sessions defeated the therapeutic process, and when that happened, she did not feel like it was ethical for her to continue therapy sessions with Kim knowing what she had done.

¶60. Having counseled Kim for three years (2014–2016), Rainey confirmed that she believed she had a "reasonable understanding of [Kim's] inner workings . . . [and] how she operates." Rainey testified that Kim's behavioral pattern is to lash out when she does not get her way. When asked, "[a]s a counselor who has been [counseling] for [twenty] years," what her opinions were about "sending a child [into a counseling session] to be recorded," Rainey testified that when Kim had Laura record their April 12, 2016 counseling session, this behavior indicated emotional abuse toward a child to gain information to use against her father. Rainey confirmed that after she learned of the recording, she sent a letter to the chancellor informing him that she could no longer be impartial at that point. She asked that

25

she be recused from any further counseling sessions among the parties and the children. At several points in her deposition, Rainey testified that her recusal request was caused by Kim's behavior.

¶61. Rainey also testified that both Kim and her father, Strahan, had told both girls to call 911 if they were scared of Greg while being with him. Rainey said she did not believe the physical-harm allegations made by Kim against Greg. She testified that Laura embellished incidents of discipline Greg placed on Laura and that Laura was a child "emotionally on overload." In her opinion, Laura's behavior was a learned behavior that her mother exacerbated, and Kim was complicit in Laura's difficulties.

¶62. Rainey's progress notes of counseling sessions with the parties and the children were admitted into evidence at trial (Exhibit 17), as well as Rainey's summary of the April 12, 2016 counseling session with Laura in which they talked about that incident. (Exhibit 18). Rainey's May 27, 2016 recusal letter was attached to her trial deposition as Exhibit 6 and admitted into evidence under seal as part of Exhibit 22 (Rainey's trial deposition with exhibits). To avoid repetition, information from these exhibits and further details from Rainey's trial deposition will addressed where applicable in our discussion below.

### III. Post-trial Proceedings

¶63. The chancery court's "Opinion and Final Judgment" was entered on September 5, 2018 (final judgment). The seventy-four page judgment set forth, in detail, the court's findings of fact and conclusions of law addressing the children's custody and related issues

26

concerning their care and support, including visitation for the non-custodial parent. The chancery court also set forth its determination on the contempt and sanctions relief Greg requested as well as its consideration of attorney's fees and costs.

¶64. The chancery court granted Greg's complaint for modification, ordering that Kim and Greg would have joint legal custody of the minor children and that Greg would have "primary" physical custody of the minor children, with Kim having periods of visitation to be mutually agreed upon between the parents. Alternatively, the chancery court set forth a specific visitation schedule (including telephonic visitation) for the parties to follow in the event they could not reach an agreement regarding visitation. Additionally, the chancery court also delineated the terms of the children's care and support in its judgment.

¶65. The chancery court also granted Greg's "Motion for Contempt and Sanctions," ordering Kim to pay $8,469.11 "as Greg's reasonable attorney['s] fees and costs incurred because of her citation for civil contempt by this Court." Kim was also ordered to pay Greg $5,330 "as fees and costs incurred by him in defense of the unfounded abuse reports [as adjudicated in the judgment] . . . as sanctions mandated under [section] 93-5-24(9)(c) for the reporting of unfounded abuse violations against him. The chancery court's additional findings and conclusions are discussed below.

¶66. Kim timely filed a "Motion for New Trial and/or to Alter or Amend Judgment" that the chancery court denied on October 18, 2018. Kim appealed on October 26, 2018, and at the same time sought a stay of the judgment. The chancery court granted Kim's motion for

27

a stay with respect to the monetary payments imposed against Kim, conditioned upon a supersedeas bond equaling 125% of the total sum Kim had been ordered to pay under the judgment. The chancery court denied Kim's motion for a stay as to all other provisions of the judgment. Kim posted the bond on December 13, 2018.

¶67. On appeal Kim asserts twenty-eight assignments of error. For clarity we combine these issues for discussion. Kim asserts that the chancery court "committed manifest error" as follows: (I) in asserting subject matter jurisdiction over Greg's complaint for modification; (II) in failing to enforce the "unclean hands" doctrine to bar Greg's claims; (III) in appointing Shannon Rainey, LPC, as the family counselor and ordering her to investigate the circumstances surrounding Laura's 911 call in January 2016 and in relying on Rainey's opinions and recommendations, both in general and specifically with respect to the 911 incident; (IV) in failing "to render sufficient findings supported by substantial credible evidence"; (V) in appointing Cynthia Re as the children's GAL and in relying on her testimony and report; (VI) in excluding pre-divorce circumstances; (VII) in excluding the Kids Hub Child Advocacy Center records; (VIII) in modifying custody without sufficient findings that a material change in circumstances occurring in Kim's home adversely affected the children and posed a danger to them; (IX) in failing to make sufficient findings in support of its *Albright*[4] analysis and in considering the children's best interests; (X) in finding Kim in contempt for surreptitiously recording counseling sessions with the first court-appointed

_____

[4] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

28

family counselor; (XI) in finding Kim violated section 93-5-24 and in imposing sanctions against her under that statute.

## STANDARD OF REVIEW

¶68.    "The scope of review in domestic cases is limited by the substantial evidence/manifest error rule. This Court will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard." *Lee v. Lee*, 154 So. 3d 904, 906 (¶5) (Miss. Ct. App. 2014) (citations omitted). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Dickinson v. Dickinson*, 293 So. 3d 322, 326 (¶5) (Miss. Ct. App. 2020) (quoting *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000). Indeed, the Mississippi Supreme Court has recognized that '[w]hen reviewing a chancellor's decision, we will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings." *Mercier v. Mercier*, 717 So. 2d 304, 306 (¶8) (Miss. 1998).

¶69.    "The sufficiency of the evidence is determined by the chancellor, who sits as finder of fact and makes determinations as to the weight and credibility of the evidence," *Peters v. Peters*, 906 So. 2d 64, 68 (¶12) (Miss. Ct. App. 2004), and "the facts of a divorce decree [are viewed] in a light most favorable to the appellee." *Id.* As the fact-finder, "[a] chancellor['s] conclusions regarding witness credibility and what weight and worth to assign to the

testimony of the various witnesses are entitled to substantial deference." *Gulfport Shopping Ctr. Inc. v. Durham*, 94 So. 3d 351, 356 (¶16) (Miss. Ct. App. 2012). "Thus, our standard of review of a divorce decree is very deferential, and we will not reverse in the absence of manifest error." *Peters*, 906 So. 2d at 68 (¶12).

## DISCUSSION

### I. Subject Matter Jurisdiction

¶70. Kim asserts two assignments of error relating to the chancery court's subject matter jurisdiction. First, Kim addresses the substance of Greg's complaint for modification. She asserts that Greg's complaint for modification was insufficient to confer subject matter jurisdiction on the chancery court because Greg did not allege that a material change in circumstances adversely affecting the children with enough specificity. Kim cites *Roberts v. Roberts*, 110 So. 3d 820, 830 (¶30) (Miss. Ct. App. 2013), in support of her argument, a case in which this Court recognized:

> [I]n order for the court to proceed on a matter for custody modification, the pleadings must contain allegations that a material change has occurred which adversely affects the child. It is inappropriate to modify child custody when the non-custodial parent did not file a motion that specifically stated or alleged that there had been a material change in circumstances that adversely affected a child.

(Citations and internal quotation marks omitted).

¶71. We find no merit in Kim's assertion. Paragraphs three and four of Greg's complaint for modification specifically allege facts concerning material changes in circumstances and their direct, detrimental impact on the children. Greg alleges, "Kim Stewart has deliberately

30

cultivated animosity in the eldest daughter, [Laura], toward her father. She further has been found in contempt of visitation and interfered with the counselor working with Greg and Ms. Shannon Rainey [(the court-appointed family counselor)]." Regarding Hannah, Greg alleges that Hannah failed the third grade after Kim removed the child from the 3-D school and enrolled her in a public school. Greg plainly asserted alleged material changes in circumstances adversely affecting the children with sufficient specificity to confer subject matter jurisdiction on the chancery court.

¶72. Also relating to her first assignment of error, Kim asserts that the chancery court lacks subject matter jurisdiction over Greg's complaint for modification because Greg requested "permanent primary" custody instead of "physical" custody of the children. Kim cites *Rush v. Rush*, 932 So. 2d 794 (Miss. 2006), to support this proposition. We find that *Rush*, however, merely lists the types of custody a court may award pursuant to Mississippi Code Annotated section 93-5-24(1)—it does not support the proposition that failing to use an exact term of art to describe the requested form of custody means that the chancery court lacked jurisdiction to modify custody. *Rush*, 932 So. 2d at 796 (¶9). Indeed, Kim's assertions are directly contrary to a plain reading of Mississippi Rule of Civil Procedure 8 that delineates the general rules of pleadings. Rule 8(a)(1) simply requires "a short and plain statement of the claim showing that the pleader is entitled to relief"; Rule 8(e)(l) provides that "no technical forms of pleading . . . are required"; and Rule 8(f) advises that all pleadings are to be "construed [so] as to do substantial justice." We find that this contention is without merit.

31

¶73. In her second assignment of error relating to this issue, Kim asserts that the chancery court erred in finding that all issues or defects in subject matter jurisdiction were waived. Because we find that the chancery court properly asserted subject matter jurisdiction over Greg's complaint for modification, which was sufficient to confer subject matter jurisdiction on the chancery court, Kim's second assignment of error is moot, and we therefore do not address it.

## II.    The "Unclean-Hands" Doctrine

¶74. The chancery court's December 29, 2015 judgment of divorce required that "[t]he parties [(Kim and Greg)] shall each enroll in an anger management course of their own choosing" and furnish the chancery court with a certification upon completion. Kim asserted the "unclean-hands" doctrine as an affirmative defense in her answer to Greg's complaint for modification. She asserts on appeal that the chancery court erred because it did not enforce this doctrine against Greg after he admitted at trial that he did not take an anger management class pursuant to the chancery court's judgment of divorce. We find no merit in this assertion.

¶75. In *Vincent v. Rickman*, 167 So. 3d 245, 249 (¶11) (Miss. Ct. App. 2015), this Court recognized that "[t]he doctrine of unclean hands provides that 'he who comes into equity must come with clean hands.'" *Id.* (quoting *Thigpen v. Kennedy*, 238 So. 2d 744, 746 (Miss.1970)). However, we also find instructive the principle that "[t]he doctrine of unclean hands cannot override the chancellor's duty to award custody in the best interests of the

32

child." *Shelton v. Shelton*, 653 So. 2d 283, 287 (Miss. 1995). The chancery court was bound to fulfill this duty and did so here, as we address below.

¶76. We further observe that "the [un]clean-hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of *willful misconduct* in the transaction at issue." *Id.* (emphasis added). In this case, although Greg admitted in his testimony at trial that he had not enrolled in an anger management class, he also explained that this was because, since the divorce, "There's been so much going on, I reckon I forgot about it. . . . I will set it up next week. I just forgot about it." We find that Greg's frank acknowledgment that he forgot about taking the course does not amount to the "willful misconduct" necessary for the unclean-hands doctrine to apply. This is particularly true here considering the extremely "protracted litigation and the contentiousness with which this case has proceeded," as reflected in the record and as the chancery court recognized in its final judgment. The docket reflects that from the entry of the judgment of divorce through the time of trial, over 150 filings were made by the parties.

¶77. For the reasons stated, we find that the chancery court did not manifestly err when it did not apply the unclean-hands doctrine to bar Greg's claims in this case.

### III. The Chancery Court's First Court-Appointed Family Counselor, Shannon Rainey

¶78. Kim asserts that the chancery court manifestly erred by (i) appointing Shannon Rainey, LPC, as the family counselor and ordering her to investigate the circumstances surrounding Laura's 911 call in January 2016; and (ii) in relying on Rainey's opinions and

33

recommendations, both in general and specifically with respect to the 911 incident. As addressed below, we find no merit in these assertions.

¶79. To briefly reiterate the salient facts, in late January 2016 there was an altercation between Greg and Laura that resulting in Laura calling 911. After learning of this incident, Kim did not require Laura to go to future visitation, leading Greg to file a motion for contempt due to Kim's failure to comply with court-ordered visitation. A few days later, Kim filed a "Motion to Hold Visitation with Specific Child ([Laura]) in Abeyance." In this motion, Kim requested that the chancery court "appoint a special expert[] to determine when and if visitation should resume."

¶80. At the March 2016 hearing on these motions (and other motions), Rainey testified at Greg's request with respect to her professional relationship with the parties. As background, Rainey had been counseling Kim and the children (without Greg) since 2014, and in the original divorce trial she testified for Kim and in favor of Kim for child custody purposes. She had not yet met Greg. Rainey testified that after the divorce, in January 2016, Greg called her and said that he wanted to repair his relationship with Laura and asked her (Rainey) if she would help him. She agreed, and Greg has been seeing her with Laura and in individual counseling sessions. Rainey also testified that Kim did not attend a joint session that she had been invited to take part in.

¶81. At the close of the hearing, the chancery court and counsel for the parties sought to resolve the issue of obtaining Laura's description of the 911 incident. Because Laura was

34

only twelve years old at the time, the chancery court did not believe it would be in Laura's best interest to expose her to questioning about the incident outside of a counseling session. The chancery court allowed Kim's counsel to make a proffer of Laura's proposed testimony. Additionally, Kim's counsel (different counsel from her current representation) suggested that "since [Rainey was at the hearing, the court could] see if she could talk to [Laura about the 911 call] and report back to the [c]ourt." Greg's counsel agreed to this course of action.

¶82. After specifically obtaining Rainey's consent on the record, the chancery court ordered that Kim, Greg, and both minor children continue in family counseling with Rainey. The chancery court further ordered that Rainey was to investigate "the circumstances and events surrounding the [911] call" and report to the chancery court her findings and recommendations. The chancery court advised Rainey that it "would appreciate [her] expertise and recommendation."

### A. Rainey's Appointment Pursuant to Mississippi Rule of Evidence 706

¶83. On appeal, Kim asserts that the chancery court erred when it appointed Rainey without conducting an on-the-record inquiry regarding her qualifications to continue acting as the family counselor and to investigate the circumstances surrounding the 911 incident. She also asserts that the chancery court erred because it did not "designate in what capacity Rainey was appointed to serve and also how her testimony was to be accepted and relied upon by the [chancery court]." We find no merit in these assertions.

¶84. Rule 706 of the Mississippi Rules of Evidence specifically allows a court to "appoint

35

any expert that the parties agree on . . . [b]ut . . . may only appoint someone who consents to act." M.R.E. 706(a). Rule 706 further provides that "[t]he court must inform the expert of the expert's duties. The court may do so in writing and have a copy filed with the clerk or may do so orally at a conference in which the parties have an opportunity to participate." M.R.E. 706(b). The chancery court complied with each aspect of Rule 706, and we therefore find no error in its decision to appoint Rainey to continue family counseling and to investigate the circumstances surrounding the 911 incident.

¶85.    In particular, the chancery court appointed Rainey with the agreement of counsel for both parties—indeed, *Kim's counsel* suggested that Rainey be appointed to "talk to [Laura about the 911 call] and report back to the [c]ourt." Further, the chancery court obtained, on the record, Rainey's consent to act in this capacity. The chancery court delineated Rainey's duties at the hearing (in the presence of counsel) and in its March 14, 2016 "Order For Family Counseling." We also observe that Rule 706 requires that the expert "must advise the parties of any findings the expert makes." M.R.E. 706(b)(1). This element was met; the chancery court specified in its May 10, 2016 "Order and Judgment on Post-Trial Motions" that it had received Rainey's "report and provided same to counsel for the parties and the GAL." Rule 706 also provides that the expert "may be deposed by any party." M.R.E. 706(b)(2). The parties took Rainey's trial deposition, and her complete deposition (with exhibits) was admitted into evidence under seal.

¶86.    We recognize that the chancery court did not specifically designate Rainey as an

36

"expert" in its order. However, the chancery court's order specifies that it was appointing "Shannon Rainey, LPC [(Licensed Professional Counsel)]" and the chancery court advised Rainey, on the record, that it would appreciate "her expertise" and recommendations in this matter. Further, in a subsequent hearing to address the parameters of Rainey's trial deposition, the chancery court found as follows:

> While the order [appointing Rainey as the family counselor] does not specifically designate Ms. Rainey as an expert witness, it is within the confines of the Court's intent that a family counselor would be more than a mere fact witness in a trial, especially concerning the custody dispute for children, as this case does.
>
> *So there won't be any questioning going forward, the Court does consider Ms. Rainey to be an expert licensed professional counselor, and her testimony would be received in that context.*

(Emphasis added). Given these circumstances and the chancery court's compliance with Rule 706's requirements, we do not find that the chancery court manifestly erred when it did not specifically designate Rainey as an expert in its initial order appointing Rainey as the family counselor and requiring her to investigate and report on the circumstances surrounding Laura's 911 call in January 2016. Plainly, the chancery court appointed Rainey as an expert in this matter and relied on her recommendations in this capacity.

### B. Rainey's Qualifications and the Reliability of Her Opinions Pursuant to Mississippi Rule of Evidence 702

¶87. Notwithstanding the fact that Rainey was ordered to continue as the family counselor with the agreement of counsel for both parties, and that *Kim's counsel* suggested that Rainey also be ordered to "talk to [Laura about the 911 call] and report back to the [c]ourt," Kim

37

now asserts that the chancery court erred in doing so because Rainey was not qualified to serve in either capacity, and her testimony lacked sufficient reliability as required under Mississippi Rule of Evidence 702. We find no merit in these contentions for the reasons stated below.

¶88. We review the admission or exclusion of evidence for an abuse of discretion. *Minter v. Minter*, 29 So. 3d 840, 851 (¶42) (Miss. Ct. App. 2009). In this regard, we observe that "the admission of expert testimony is within the sound discretion of the trial judge; therefore, the trial judge's decision will stand unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id.*[5]

¶89. The admissibility of expert testimony is governed by Rule 702 of the Mississippi Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

[5] At the December 18, 2017 hearing to address the parameters of Rainey's trial deposition, counsel informed the chancery court that they would include any objections to Rainey's testimony in the record at her trial deposition. At that deposition, Kim's lawyer objected to counsel opposite's perceived attempt to elicit expert testimony from Rainey, and the lawyers agreed that if the chancery court, when reviewing Rainey's trial deposition, found that her testimony should be excluded on this basis, the subject testimony would not be considered by the chancery court. The objection was overruled, as the chancery court considered Rainey's testimony in her capacity as an expert.

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

¶90. In applying Rule 702, "[t]he trial court must first determine if the expert's testimony is relevant; that is, does the testimony assist the trier of fact. Then, the trial court must determine if the proffered testimony is reliable." *Minter*, 29 So. 3d at 852 (¶43) (internal citations omitted). In *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31, (Miss. 2003), the supreme court recognized that "the trial court has 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Id.* at 37 (¶13) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

¶91. We find no abuse of discretion in the chancery court's reliance on Rainey's testimony in her capacity as a family counseling expert. The record reflects that Rainey is a licensed professional counselor who has been a counselor for almost twenty years. She has a bachelor's degree in psychology and a master's degree in counselor education, with an emphasis in community counseling. She has been accepted as an expert "multiple times" over the past years, including cases involving children. We also find relevant that Rainey had been counseling Kim and the children since 2014 (over two years prior to her appointment to continue family counseling); in the original divorce trial Rainey testified for

Kim and in favor of Kim for child custody purposes;[6] and, at Greg's request, had recently begun counseling Greg, individually, and with Laura, after the divorce trial.

¶92.    Kim asserts that Rainey had a "conflict of interest" because she had testified at Greg's request at the March 2016 hearing, but it was at that very hearing that Kim's counsel agreed to Rainey's appointment to continue family counseling. That argument is waived.  In any event, Rainey testified that as counselor she did the job she was asked to do, and, in fact, that it was Kim who initially asked Rainey "to begin trying to work with Greg to, quote, make him a better father."

¶93.    Even though Kim's counsel also suggested that Rainey be ordered to talk with Laura and report back to the parties and the chancery court about the 911 incident, Kim now asserts that Rainey was unqualified to investigate the circumstances surrounding Laura's 911 call because Rainey had no specialized training or certification in forensic interviewing or in investigating abuse.  As Rainey explained in her deposition, however, she was not asked to do a forensic interview; her role was to hold "a therapy session to inquire with the child" about the incident, and that is what she did.  As we have detailed above, this is precisely what the chancery court, and counsel for the parties, intended for Rainey to do in a joint effort to obtain Laura's description of the 911 incident.  Rainey was ordered to perform this interview and report back to the chancery court because the court did not believe it would be in Laura's

---

[6] In her trial deposition, Rainey testified that she did not recall whether she testified as an expert in the original divorce trial.

best interest to expose her to questioning about the incident outside of a counseling session. Kim's counsel suggested that Rainey be the person to undertake that investigation in a counseling session with Laura. Kim's contentions that Rainey was unqualified to act in the capacity of court-appointed counselor and to investigate the circumstances of the 911 call are without merit.

¶94. Kim also asserts that Rainey's opinions with respect to the 911 incident lack reliability because they are not based upon sufficient facts and data, faulting Rainey for not talking to Hannah, who was also at Greg's for visitation that weekend. This contention is without merit. Rainey talked to Laura and to Greg—the very people involved in the incident. As for Hannah, Rainey testified that she would not want to put Hannah in a position where she may have felt like she would have to take sides. We find that this is a legitimate concern expressed by a counselor who had been seeing the girls for nearly three years. We further find that the fact that Rainey did not talk to Hannah does not undermine her report or recommendations about the incident.

¶95. We also find no merit in Kim's assertions that the chancery court erred in relying on Rainey's account of her counseling session with Laura about the 911 incident because it purportedly "is not an accurate reflection of any statements by [Laura] during the April 12 [counseling] session concerning the altercation and/or the 911 call." Kim relies on the transcript from her secret recording of that counseling session that Kim obtained by hiding a recorder in Laura's purse. The chancery court had before it Rainey's report and her

summary of the counseling session as well as the transcript from the surreptitiously recorded session. Based upon our deferential standard of review with respect to determinations regarding the weight of the evidence, *Peters*, 906 So. 2d at 68 (¶12), we find no manifest error in the chancery court's findings regarding the 911 incident.

¶96. In sum, we find no merit in Kim's contentions regarding Rainey's qualifications or the reliability of her opinions regarding the 911 incident. Based upon our own review of the record, we find no manifest error in the chancery court's reliance on this information in denying Kim's "Motion to Hold Visitation in Abeyance" and in granting Greg's motion for contempt.

¶97. Additionally, we find no merit in Kim's assertions that Rainey's opinions regarding Kim's behavioral patterns, Laura's emotional state, and Kim's influence on Laura's attitude toward her father lack reliability.[7] Rainey had been Kim and the children's clinical therapist for nearly three years and documented these sessions with notes that were also admitted into

_____

[7] In her appellant's brief, Kim specifically asserts:

[The chancery court] erred in admitting and relying upon the following improper expert testimony offered by Shannon Rainey despite not having been designated, offered, or qualified as an expert: that Kim's behavioral pattern is to lash out when she does not get her way; that Kim's recording of the counseling session indicates emotional abuse toward the child to gain information to use against the father; that [Laura] is a child that is emotionally on overload; that [Laura's] behavior is a learned behavior exacerbated by her mom and Kim is complicit in [Laura's] difficulties; that there is no relationship repair opportunity for [Laura] and Greg so long as [Laura] lives with Kim; and that [Laura] imitates her mother's negative attitudes toward Greg and is learned behavior.

42

evidence. These counseling-session summaries and notes further support the chancery court's findings as to these issues. This contention is without merit.

¶98. In sum, we find no abuse of discretion in the chancery court's relying on Rainey as an expert in this case. We further find no error in the chancery court's relying on Rainey's expert testimony as support for its findings in this case. Rule 703 of the Mississippi Rules of Evidence, concerning the bases of an expert's opinion testimony, expressly provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." M.R.E. 703. Based upon these determinations, we find that Kim's other assignments of error regarding Rainey's testimony—that the chancery court erred in "granting any weight" to Rainey's testimony because it was "hearsay" and was "not even admissible as lay witness opinion testimony [under Mississippi Rule of Evidence 701]"—are moot and we therefore do not address them.

### IV. Kim's Assertion that the Chancery Court Failed "to Render Sufficient Findings Supported by Substantial Credible Evidence"

¶99. Kim devotes eighteen pages of her appellant's brief to asserting that the chancery court "failed to render sufficient findings supported by substantial credible evidence" relating to twenty-two factual findings by the chancery court in its final judgment. These findings concern Kim's behavior as it related to the parties' custody and visitation arrangements; the parties' and children's (particularly Laura's) counseling sessions; Hannah's schooling; Kim's

43

influence on Laura and her relationship with her father; and Kim's credibility.[8] Kim makes essentially the same contentions in her assignments of error specifically regarding the chancery court's custody modification, contempt, and sanctions decisions. We address her assertions regarding the purported lack of substantial credible evidence to support the chancery court's determinations on these issues below. We therefore find that the instant assignment of error is redundant, and thus it will not be separately addressed. *See, e.g.*, *Bougon v. State*, 405 So. 2d 101, 104 (Miss. 1981).

## V. The Chancery Court's Court-Appointed Family Guardian ad Litem, Cynthia Re, and Allocation of Her GAL Fees

¶100. Kim asserts that the chancery court erred in appointing the GAL as an expert and in relying upon her testimony and report. Kim also asserts that the chancery court erred in allocating 70% of the remaining GAL fees to her and only 30% to Greg.

### A. The GAL's Qualifications, the Reliability of Her Testimony, and the Chancery Court's Reliance on Her Testimony and Report

---

[8] In sub-paragraph(d) of this assignment of error, Kim does assert a legal argument that the chancery court "erred by . . . reviewing Rainey's [May 27, 2016] letter of resignation . . . outside the presence of all parties and their respective counsel . . . [and thereby] . . . failed to give either party an opportunity to object in advance to the [chancery court] reviewing said letter." The case Kim cites in support of this contention is a case in which the supreme court found that the chancellor inappropriately referenced a "conference in chambers" in its order regarding a mother's lack of cooperation with the GAL when the record contained no information regarding the referenced conference or what took place at it. *S.G. v. D.C.*, 13 So. 3d 269, 274 (¶15) (Miss. 2009). That is not the situation here. On the contrary, the chancery court in this case gave copies of Rainey's resignation letter to counsel, it was filed in the record on June 8, 2016, and was admitted into evidence as Exhibit 6 to Rainey's trial deposition without objection. This assertion is meritless.

¶101. We begin by addressing Kim's first assignment of error on this issue. Specifically with respect to this issue, Kim asserts that the chancery court erred in appointing the GAL because it did not qualify her as an expert on the record. She further asserts that Cynthia Re was not qualified to serve as the GAL, nor was her testimony or report "reliable" under Rule 702. These assertions are without merit.

¶102. The chancery court's "Order Appointing Guardian Ad Litem" specifically provides that Cynthia Re was designated as an expert pursuant to Rule 706 of the Mississippi Rules of Evidence and "Mississippi Law, as provided in *S.G. v. D.C.*, 13 So. 3d 269 (Miss. 2009) and *McDonald v. McDonald*, 39 So. 3d 868 (Miss. 2010)." The order further provides that the GAL's opinions and recommendations would be treated as expert testimony, as follows:

> Therefore, the opinions and recommendations offered by the Guardian ad Litem, and the factual basis for these opinions derived in the course of the investigation, shall be governed by Rule 702, Rule 703, Rule 803(6), (8), (24) and (25); and Rule 804 of the Mississippi Rules of Evidence, and any other applicable rules governing the presentation of expert opinions.

¶103. Rule 706 specifically allows a court to "appoint any expert . . . of its own choosing," and in that process may "order the parties to show cause why [an] expert witness[] should not be appointed." M.R.E. 706(a). The chancery court's order specifically addressed this requirement, as well as any challenges pursuant to the GAL's qualifications, as follows:

> Any objections by any party to the appointment of the Guardian ad Litem as an expert witness in this case, and any challenges to the qualifications of the Guardian ad Litem, shall be filed within ten (10) days after the date of this Order and promptly scheduled for hearing.

The record reflects that no objections to Cynthia Re's appointment as the GAL or challenges

45

to her qualifications were made before the chancery court. Accordingly, Kim's challenge to Cynthia Re's appointment and qualifications on appeal is waived. *McBeath v. State*, 739 So. 2d 451, 454 (¶¶10-11) (Miss. Ct. App. 1999) (finding appellant waived the issue regarding an expert's qualifications, recognizing that "[t]he supreme court has refused to hold that an expert was not properly qualified when the opposing party did not object to the witness's credentials but only to the testimony").

¶104. In any event, we find that Cynthia Re was properly appointed as the GAL pursuant to Rule 706 and the procedure set forth in that rule. We further find that she was qualified to serve as the GAL in accordance with Rule 702. In its order appointing her as the GAL, the chancery court specifically set forth her qualifications as follows:

> The Court finds that Hon. Cynthia A. Re . . . is an attorney licensed to practice law in this state who has received the requisite training and is duly certified to serve as Guardian ad Litem for the best interests of the minor children in this case. The Court is of the opinion that [Re] should be, and hereby is, appointed as Guardian ad Litem for the minor children.

In its final judgment, the chancery court also specifically noted Cynthia Re's "considerable experience serving as Guardian ad Litem in the 10th Chancery Court District of Mississippi."

¶105. Kim also asserts that the GAL's report and her testimony were unreliable under Rule 702 because they were not based upon sufficient facts or data, which is an objection her counsel did raise before the chancery court. We find no merit in this contention. The GAL's report was admitted into evidence and sets forth the extensive work performed by the GAL in this matter. According to her report, during her investigation the GAL contacted and

46

interviewed Kim, Greg, the children (she even provided Laura with her cell phone number), the children's maternal grandfather (Billy Strahan), their paternal grandmother, their maternal aunt, members of the staff and a teacher at the 3-D school that Hannah attended, Jamie Stinson (Kim's current husband), Dr. Kent and other Hattiesburg Clinic staff members, Debra Carr (the court-appointed counselor), staff members of Kids Hub Child Advocacy Center (Kids Hub) who conducted forensic interviews of the children, and case workers at DHS/CPS. The GAL was present at the children's Kids Hub interviews, and the GAL also reported that she reviewed all the pleadings provided by the parties' counsel, the children's school records, Kim's and Greg's psychological evaluations, and other items. The GAL also attended trial, heard the testimonies of the witnesses, and questioned some of them. During her own testimony, the GAL was examined by counsel for both parties and the chancery court.

¶106. We find that Kim waived any objections to Cynthia Re's qualifications as the GAL, and even if she had not, Cynthia Re was qualified to serve as the children's GAL. We further find that based on our own review of the record, the GAL's testimony and report were based upon sufficient facts and data and were reliable under Rule 702.

¶107. Maintaining that the GAL's testimony was not qualified expert opinion testimony, Kim asserts that the GAL's testimony and report are inadmissible hearsay and that the chancery court manifestly erred in relying upon this information. Kim cites *McDonald v. McDonald*, 39 So. 3d 868 (Miss. 2010), and *Ballard v. Ballard*, 255 So. 3d 126 (Miss. 2017),

47

in support of this argument. In both cases, however, the supreme court recognized "that guardians ad litem—properly appointed under Rule 706 and qualified as experts under Rule 702—may rely on hearsay in reaching their opinions." *Ballard*, 255 So. 3d at 133 (¶20) (quoting *McDonald*, 39 So. 3d at 887 (¶68) (Dickinson, J., specially concurring)). We find that the GAL's testimony and report are admissible in this case, and we find Kim's assertion without merit. M.R.E. 703.

¶108. Further, although in *Ballard* the supreme court held that "a chancery court cannot rely on guardian ad litem hearsay that is not within one of the enumerated exceptions as substantive evidence," 255 So. 3d at 136 (¶30), we do not find that is the case here. In *Ballard*, the supreme court found that "the chancery court's analysis determining [a mother's] unfitness focused primarily on the guardian ad litem's report and testimony . . . all of which consisted of the guardian ad litem's third-party interviews . . . . None of the persons interviewed by the guardian ad litem [in *Ballard*] testified at trial except the parties and one [other person]." *Id.* at 132-33 (¶18). Moreover, "[d]espite a recommendation from the guardian ad litem . . . that the chancery court should not apply the family-violence presumption, the chancellor relied on the hearsay contained within her report to disagree with her recommendation and apply it." *Id.*

¶109. In contrast here, other than the children, nearly all the other witnesses the GAL interviewed also testified at trial and/or in post-divorce hearings and were subject to cross-examination by both parties, including Greg, Kim, Kim's father, Laura's teachers, DHS/CPS

representatives, Kim's new husband, Debra Carr (the latter court-appointed family counselor), and Shannon Rainey (the former court-appointed family counselor) by deposition. Similarly, the documents the GAL reviewed in forming her opinions and writing her report were admitted into evidence at trial and reviewed by the chancery court. This evidence includes, but is not limited to, the parties' psychological evaluations by Dr. Datz, counseling session notes and summaries from Shannon Rainey, text messages between the parties, Hannah's 3-D school report, and DHS/CPS reports and investigative notes. Unlike the chancery court in *Ballard*, the chancery court in this case independently heard the testimony of the parties and reviewed the evidence in reaching its conclusions. Further, to the extent that the chancery court relied on the GAL's opinions, testimony, or report, it was not as support for a finding contrary to a recommendation by the GAL.

¶110. As such, we find *Smith v. Smith*, 206 So. 3d 502 (Miss. 2016), rather than *Ballard*, instructive. In *Smith*, the supreme court began its discussion of the "supposed inadequacies" in a GAL's work by emphasizing that "the ultimate custody decision always falls on the chancellor." *Smith*, 206 So. 3d at 512 (¶22). Continuing, the supreme court explained that "the precise question we must answer is whether the evidence in the record supports the chancellor's decision." *Id.* The supreme court found that "an abundance of additional information [other than the GAL's report] was also before the chancellor, including both forensic interviews, extensive testimony from the parties and witnesses who supervised visitation, and the second interviewer's deposition. We thus find there was ample evidence

49

for the chancellor to make a custody decision." *Id.* (¶23); *see also McDonald*, 39 So. 3d at 883 (¶50) (finding that "[t]he chancellor did not allow the GAL to usurp his role as the ultimate finder of fact [where the] . . . chancellor heard all witnesses, read all the reports, and made his own decision based upon independent findings of fact"). The same is true in this case. We find that the chancery court's decision in this case was supported by ample evidence in addition to the GAL's report and testimony, and thus, for this additional reason, we find Kim's inadmissible-hearsay assertions without merit.

¶111. We also reject Kim's contention that the GAL failed to serve in the children's best interest because she did not provide an overall recommendation as to custody in her report. Kim cites *In re D.K.L.*, 652 So. 2d 184, 188 (Miss. 1995), in support of this contention. We find *In re D.K.L.* distinguishable and not applicable here. First, Cynthia Re *did* provide recommendations as to specific *Albright* factors in her testimony at trial,[9] but candidly admitted she could not give an ultimate recommendation as to custody given the turmoil and history of this case. Like the chancery court, we find that "the GAL's honest . . . inability to make a custody recommendation to be further indicative of the extreme difficulty determining what is in the best interests of [Laura and Hannah] in this case." The chancery court found that Re "has performed her duties as GAL to the best of her ability given the considerable challenges of this case," and that her "Report and Findings are supported by the

---

[9] The GAL's findings and recommendations are discussed below when we address the chancery court's *Albright* analysis.

preponderance of the credible evidence presented at trial." Indeed, as the supreme court recognized in *Smith*, 206 So. 3d at 512 (¶22), "the ultimate custody decision always falls on the chancellor."

¶112. Further, in *In re D.K.L.* (the case Kim cites), the supreme court found the record "devoid" of any action taken by the GAL in the child's best interest—the GAL simply deferred to the therapist's recommendations and briefs of the parties in stating that "he did not have any specific recommendation as to what was in the child's best interest." *In re D.K.L.*, 652 So. 2d at 188. In contrast, Cynthia Re deferred to the court's judgment in making this determination only after devoting immense effort investigating this case, reporting her findings to the parties and the court, and testifying at trial. In short, we find Kim's assertion that the GAL did not serve the best interests of the children in this case wholly without merit.

## B. The Chancery Court's Allocation of the Remaining GAL Fees

¶113. Finally, Kim asserts that the chancery court committed "manifest error" when it assessed her 70% (and Greg 30%) of the $6,010.75 unpaid balance remaining on the GAL's fees without any findings supporting this allocation or indication that the chancery court considered Kim's ability to pay. We find no merit in this contention.

¶114. As an initial matter, the chancery court's final judgment *did* include findings of fact addressing the testimonies of Kim and her father Billy Strahan regarding Kim's financial situation. Although the chancery court did not make specific findings with respect to Kim's

ability to pay when addressing its allocation of the remaining GAL fees, "this Court will assume that the issue was decided consistent with the [chancery court's] judgment and these findings will not be disturbed on appeal unless manifestly wrong or clearly erroneous." *Crosby v. Mittelstaedt*, 186 So. 3d 415, 421 (¶13) (Miss. Ct. App. 2016).

¶115. More importantly, "'[o]ur rules of procedure treat guardian ad litem fees as court costs to be awarded against the non-prevailing party.'" *McCraw v. Buchanan*, 10 So. 3d 979, 985 (¶20) (Miss. Ct. App. 2009) (quoting *Miss. Dep't of Human Servs. v. Murr*, 797 So. 2d 818, 821 (¶9) (Miss. 2000)). In this regard, "[t]his Court has held that chancellors possess large discretion in apportioning costs, including the costs of the GAL. . . . If upon review this Court finds that the decree apportioning the costs [of the GAL] works a manifest injustice on any of the parties, the decree will be reversed." *Shows v. Cross*, 238 So. 3d 1224, 1235 (¶47) (Miss. Ct. App. 2018) (citations and internal quotation marks omitted).

¶116. We find no "manifest injustice" in the chancery court's ruling on the GAL fees in this case. Indeed, in *Shows*, 238 So. 3d at 1235 (¶48), this Court found no "manifest injustice" in the chancellor's assessment of *100%* of the remaining GAL fees against the child's father, who was the non-prevailing party in his child-custody modification action, where both the GAL and the child's counselor found no evidence substantiating the father's abuse allegations underlying his petition seeking custody modification. *See also McCraw v. Buchanan*, 10 So. 3d 979, 985 (¶¶19-21) (Miss. Ct. App. 2009) (The Court affirmed a 50% allocation of GAL fees against a mother who was the non-prevailing party in an action for

52

child custody modification brought by the child's father and grandmother, recognizing that "[t]he chancellor, within his discretion, could have assessed the *total* amount of [GAL] costs and fees to [the child's mother], who is considered the non-prevailing party." (emphasis added)). As we detail below, similar circumstances are present here. We "[t]herefore cannot say that the chancellor abused his 'large discretion' by requiring [Kim] to pay [70% of] the GAL's final bill." *Shows*, 238 So. 3d at 1235 (¶48).

## VI. Exclusion of Pre-Divorce Circumstances

¶117. During Kim's direct examination at trial, Kim's counsel sought to elicit testimony about Kim's prior abuse allegations occurring during the divorce and "problems with [Laura] . . . that occurred at the time of the start of the divorce, . . . continu[ing] through the divorce, . . . post-divorce[,] and to present." Greg's counsel objected with respect to testimony concerning pre-divorce circumstances. The chancery court sustained that objection as to testimony prior to December 29, 2015—the date the final judgment of divorce was entered. Kim then testified that the relationship between Laura and Greg was "strained" as of December 30, 2015. Kim further testified about Laura and Greg's relationship from that point forward.

¶118. We find no abuse of discretion in the chancery court limiting Kim's testimony in this manner. "In the ordinary modification proceeding, [one of the factors] the non-custodial party must prove [is] . . . that a substantial change in circumstances has transpired *since issuance of the custody decree*." *Mabus v. Mabus*, 847 So. 2d 815, 818 (¶8) (Miss. 2003)

53

(emphasis added); *see Powell v. Powell*, 976 So. 2d 358, 361 (¶11) (Miss. Ct. App. 2008). "In determining whether a material change in circumstances has occurred, the chancellor must consider the totality of the circumstances." *Powell*, 976 So. 2d at 361 (¶11). The final judgment of divorce, placing the children in Kim's sole physical custody, was entered December 29, 2015, and thus the chancery court properly considered evidence pertaining to that time forward. As the supreme court recognized in *Bowe v. Bowe*, 557 So. 2d 793, 794 (Miss. 1990), "[t]he familiar rule that a judgment for alimony, custody[,] or support may be modified only upon a showing of a *post-judgment material change of circumstances* is a recognition of the force of res judicata in divorce actions." (Emphasis added).

¶119. Kim asserts that under *Powell*, the chancery court should have considered pre-divorce circumstances in determining whether custody modification was appropriate in this case. In *Powell*, the Court reversed and remanded the chancery court's decision that a change in custody was not warranted where the chancery court failed to consider a host of *post-divorce* circumstances. *Powell*, 976 So. 2d at 362 (¶¶17, 18). The Court also recognized the general res judicata rule stated above. *Id.* at 363 (¶21). The Court then separately addressed whether the chancery court erred in considering "the family's pre-divorce moves" in assessing whether the mother's frequent relocations were a factor warranting a change in custody from the children's mother to their father. *Id.* at (¶¶20-23). The Court found that "[u]nder the facts of the instant case, we find no error in the chancellor's *limited consideration*" of this information. *Id.* at (¶22) (emphasis added). In so holding, the Court specifically recognized

54

that the mother's "suitability under the conditions existing at the time of the original decree was not at issue." *Id.* at (¶24).

¶120. We find that the Court's limited ruling regarding pre-divorce circumstances in *Powell* is not applicable in this case. The evidence Kim sought to present *did* put Greg's suitability prior to the divorce in issue, and, in any event, it is not relevant. The record reflects that the relationship between Greg and Laura was strained at the time of the divorce—Greg, himself, admitted this at trial, and Rainey testified in her trial deposition that this was the very reason Greg sought her help through counseling after the divorce trial. Plainly, the relevant evidence is the parties' and the children's post-divorce conduct and interactions in determining whether a custody modification was warranted in this case. Our review of the record and the chancery court's final judgment, as well as its numerous rulings in the course of the litigation, show that the chancery court carefully considered the totality of the circumstances in determining whether a "substantial change in circumstances ha[d] transpired since issuance" of the December 29, 2015 final judgment of divorce in which Kim was granted sole physical custody of the minor girls. *Mabus*, 847 So. 2d at 818 (¶8). We find no abuse of discretion in the chancery court's decision to consider testimony and evidence limited to post-divorce circumstances in making its modification and contempt determinations.

## VII. Exclusion of the Kids Hub Child Advocacy Center Records

¶121. At trial, Kim sought to admit into evidence forensic interviews of Laura and Hannah

taken in January 2017 at the Kids Hub Child Advocacy Center. On appeal, Kim asserts that the chancery court abused its discretion in excluding these interviews. To briefly reiterate the circumstances relating to this issue, Laura, while at a doctor visit, spoke to Dr. Lowe alone and reported abuse by Greg. Dr. Lowe contacted DHS/CPS, and DHS/CPS initiated an investigation. The forensic interviews were done at the request of DHS/CPS investigator Chelsiah Butler. The chancery court addressed these circumstances in a two-day hearing in February 2017 on Kim's December 22, 2016 "Emergency Motion to Temporarily Suspend Visitation"; Greg's January 18, 2017 "Motion for Attorney Fees"; and Greg's January 31, 2017 "Third Motion for Contempt." The chancery court denied Kim's motion and granted Greg's motions. The chancery court's rulings were not appealed.

¶122. In seeking to have the Kids Hub interviews admitted, Kim's counsel acknowledged that "[o]bviously, the Court has already found they [the abuse allegations] were unsubstantiated. DHS already found they were unsubstantiated." Nevertheless, counsel stated that they were being offered for the chancery court's consideration "to show the allegations that were made and that they were corroborated by the younger child." The chancery court allowed the Kids Hub interviews to be admitted for identification purposes and informed Kim's counsel that he could approach the issue again "when [Kim] puts on her case." No attempt was made to admit the interviews into evidence at that time.

¶123. However, during the GAL's testimony at trial, Kim's counsel objected when Cynthia Re, the GAL, testified about a statement Laura gave during her Kids Hub interview. Kim's

counsel asserted that Cynthia Re was relying on the Kids Hub interviews, and these records, rather than the GAL's testimony, were the best evidence of what took place. The GAL, however, explained that she was present during the children's Kids Hub interviews and that her testimony was based on what she heard. The chancery court overruled Kim's counsel's objection, finding that the GAL's testimony "[was] based on what she heard . . . when she was present as opposed to what the records show or do not show. So they will remain marked as Exhibit 4 for ID only."

¶124. We find no abuse in the chancery court's ruling on this issue. Referring to one page in the chancery court's seventy-four-page final judgment, Kim asserts that the chancery court erred in excluding the Kids Hub interviews especially because it "referenced and relied upon substantive information from Exhibit 4-ID in rendering [its] decision." This statement is inaccurate. In addressing the *Albright* factors in its final judgment, the chancery court first included, verbatim, the GAL's findings in her report on each particular factor and then set forth its own findings. In addressing the parenting-skills *Albright* factor, the chancery court included the GAL's two-sentence reference to information Laura conveyed to the Kids Hub interviewer. Our review of the chancery court's actual findings on this factor, however, indicates that it did not rely on this information in its determination on the parenting-skills *Albright* factor. In any event, even if exclusion of the Kids Hub interviews was in error, it was harmless error. As Kim's counsel admitted, DHS/CPS found that the abuse allegations were unsubstantiated, and Kim does not appeal the rulings on the motions that were heard

in February 2016 in which these abuse allegations were at issue.[10]

### VIII. The Child-Custody Modification Decision

¶125. Kim asserts seven assignments of error concerning the chancery court's child-custody modification decision. We combine these assertions in our discussion here. Kim essentially asserts that the chancery court manifestly erred in modifying child custody and granting Greg sole physical custody of the children because its findings were purportedly not "specifically" attributable to its modification decision or supported by substantial credible evidence. For the reasons stated, we find Kim's assertions are without merit.

¶126. "A modification of custody requires the noncustodial parent to prove: (1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Powell*, 976 So. 2d at 361 (¶11). The chancery court "must consider the totality of the circumstances" in determining whether a material change in circumstances has occurred. *Id.* "Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children." *Bredemeier*, 689 So. 2d at 775. "Any change in custody must be predicated on the conduct of the custodial parent that poses a danger to

---

[10] We acknowledge that Kim does appeal the chancery court's imposition of sanctions under section 93-5-24(9)(c) relating to Kim's unfounded abuse allegations. But Kim's argument in that respect is that she did not directly report the allegations—not whether the allegations were substantiated or unfounded. The Kids Hub records are not relevant with respect to Kim's contention that she did not directly report the abuse allegations.

the mental or emotional health of the child." *Sullivan v. Beason*, 37 So. 3d 706, 708 (¶8) (Miss. Ct. App. 2010).

¶127. As the supreme court observed in *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996), "[a]bove all, in modification cases, as in original awards of custody, we never depart from our polestar consideration: the best interest and welfare of the child." The supreme court specifically observed:

> The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer.

*Id.* at 745 (citations and internal quotation marks omitted).

¶128. We give substantial deference to a chancery court's factual findings, recognizing that in this regard, the chancery court "has the ultimate discretion to weigh the evidence the way [it] sees fit in determining where the child's best interest lies." *O'Briant v. O'Briant*, 99 So. 3d 802, 806-07 (¶19) (Miss. Ct. App. 2012).

¶129. With these standards in mind, we first observe that the chancery court's final judgment is seventy-four pages long. In that judgment the Court detailed the testimony presented at trial from Debra Carr (the current court-appointed family counselor), Gabrielle Tripp (an investigator with CPS), Greg, Judy Lanyon and Ashley Andrews (teachers at Laura's school), Kim, Billy Strahan (Kim's father), Jamie Stinson (Kim's new husband), Cynthia Re (the GAL), and former court-appointed family counselor Shannon Rainey by deposition. The

chancery court also reviewed numerous exhibits admitted into evidence and cites to particular information in these exhibits in its judgment in support of its findings.

¶130. Regarding its modification decision in particular, the chancery court devoted seventeen pages of its final judgment specifically to this issue, detailing the testimony, recommendations, and evidence supporting its finding "that all of the above constitutes a material change in circumstances adverse to the best interests of both [Laura] and [Hannah] in the home of the custodial parent, Kim [Stewart] Stinson." The chancery court further found:

> The Court accepts Ms. Carr's recommendations in her testimony that [Laura] be assessed and evaluated at Brentwood . . . . [Carr has further] recommended assessment and evaluation for [Laura] and her emotional issues.

> The events precipitating and supporting these findings and recommendations have occurred while both girls were living with Kim as the custodial parent. The Court finds such to *constitute a material change since entry of the last custody decree*; that the change *adversely affects both children*; and that custody modification consideration is in *the children's best interests*. The Court finds that Kim's negative behavior and misconduct toward Greg since the entry of the divorce judgment *poses a clear and genuine danger to [Laura's] and [Hannah's] physical, mental, or emotional health and/or well-being and rises to the level of such material change in circumstances*.

(Emphasis added).

¶131. Kim asserts that the chancery court was "manifestly wrong" in making this determination because Kim was not the only custodial parent as of July 2017, when then parties agreed to joint custody, and because Carr testified that she did not "have a particular way of deciding" whether either parent was the cause of Laura's emotional problems. But

the chancery court in no way relied solely on Carr's testimony in reaching its custody modification decision. In taking this one conclusion out of context, Kim ignores the numerous findings of fact that the chancery court delineated in its final judgment in support of its conclusions, and the substantial credible evidence that we find support them, as discussed below. We find Kim's assertion on this point is without merit.

¶132. Kim also asserts that the chancery court erred with respect to its child-custody modification decision because it did not make findings "specifically" attributable to its findings that there had been material changes in circumstances that adversely affected both children and posed a danger to the children's mental or emotional health or well-being. Additionally, Kim asserts that the chancery court's findings as to each of these elements are not supported by substantial credible evidence. We find that Kim's assertions are without merit and that the chancery court's modification decision is supported by substantial credible evidence. We now turn to addressing the testimony and evidence relied upon by the chancery court in support of its findings.

### A. Findings Relating to Hannah

¶133. Specifically regarding Hannah, the chancery court found that a material change in circumstances affecting Hannah's best interests was Hannah failing the third grade at Oak Grove after moving to the Lamar County School District while in Kim's custody.[11] This

---

[11] Kim takes issue with the chancery court's finding that Hannah "failed" third grade when, actually, she did not. This contention does not support a finding of error. In its temporary order requiring that Hannah be moved to the 3-D school, the chancery court

61

development was made known to Greg in May 2016. After a hearing addressing this issue was held in August 2016, the chancery court entered its "Temporary Order of August 9, 2016" in which it found that "after a careful review of the documentary evidence and the testimony of the parties, and that of Ms. Re, the Guardian ad Litem, Hannah shall be moved to and continue her education at the 3-D School in Petal." The chancery court found that Hannah had done well at the 3-D school, as supported by the testimony of the court-appointed family counselor, Debra Carr.

¶134. Kim asserts that "[a] custody modification should not be ordered based on an alleged material change in circumstance that has been remedied." She cites *Ruth v. Burchfield*, 23 So. 3d 600 (Miss. Ct. App. 2009), in support of this proposition, asserting that because Hannah is now doing well, having attended two years at the 3-D school, that this issue is moot as a material change. We find no merit in this assertion. In *Burchfield*, this Court found that inappropriate activities occurring in the mother's home did not constitute a material change in circumstances where "[the mother] removed the conditions that could have arguably had an adverse effect on [the child] had they been allowed to continue." *Id.* at 606-07 (¶¶18-20). In contrast, Kim did not move Hannah to the 3-D school on her own

---

specifically found "compelling the fact that [Hannah] failed *the state test three times*, but received a good cause exemption and was promoted to the next grade in the Lamar County School System." (Emphasis added). The chancery court then found that "[w]hile recognizing that the law allows a good cause exemption, the Court does not find the good cause exemption to be a dispositive factor as to the issue of which school [Hannah] should attend for her educational needs and focus going forward and in keeping with her best interests."

initiative. On the contrary, Kim resisted the change in schools, requiring a hearing on the issue in August 2016.

¶135. We find that Kim, in equity, cannot claim that the material change was ameliorated where she was forced to do so by the chancery court's temporary order and not on her own initiative. *See Story v. Allen*, 7 So. 3d 295, 298-99 (¶21) (Miss. Ct. App. 2008) (finding, in the analogous *Albright* factors analysis, that the court in equity will not allow a party to benefit by that party's own malfeasance in assessing the best interests of the child). As such, we find no manifest error in the chancery court's reliance on these circumstances in finding a material change in circumstances supporting its custody modification with respect to Hannah.

### B. Findings Relating to Laura and Hannah

¶136. We now address the chancery court's findings supporting its conclusion that there had been "a material change in circumstances adverse to the best interests of both [Laura] and [Hannah] in the home of the custodial parent, Kim [Stewart] Stinson" and that "Kim's negative behavior and misconduct toward Greg since the entry of the divorce judgment poses a genuine danger" to Laura and Hannah's emotional and mental health and well-being.

¶137. These findings include the chancery court's findings surrounding Kim's recording of the March 26, 2016 and April 12, 2016 counseling sessions, as follows:

> The Court finds that the direct and damaging result of Kim's . . . recording of [the March 26, 2016 and April 12, 2016] counseling sessions was the requested recusal of Ms. Rainey (granted by the Court) as court[-]appointed Family Counselor thereby necessitating a "start all over" court-appointed

63

Family Counselor Debra Carr. . . . The Court finds that Kim did so knowingly, intentionally, willfully, and contumaciously in an effort to defeat Rainey's efforts to improve the parent-child relationship between Greg and [Laura] and [Hannah] at a time when the relationship was improving. . . .

We find that this determination is supported by the substantial credible evidence as identified in the chancery court's judgment and in our own review of the record.

¶138. Specifically, the record reflects that Rainey testified that the recordings defeated the therapeutic process and confirmed in her trial deposition that her recusal request was caused by Kim's behavior. Rainey also testified that Kim resisted continued family counseling. According to Rainey, her relationship with Kim began to deteriorate as Greg's relationship with the girls improved. According to Rainey, at first, Kim asked Rainey to try and work with Greg to "quote, make him a better father," but once Rainey started doing so, Kim told her it was too late and that she did not want it anymore. Rainey also testified that after she suggested that both parties should have a good relationship with the children and that Greg should have time with the children, she found that Kim was no longer willing to work with her to help the girls develop a better relationship with their father. Additionally, Greg testified that when Rainey was the counselor, he believed that he was making real headway at improving his relationship with Laura. When Kim recorded the sessions and Rainey was no longer their counselor, this caused his relationship with Laura to go "back to zero" and they had to start again with Carr.

¶139. The chancery court further found "from the preponderance of the credible evidence that Kim has made known her negative attitude and perspective of Greg to both [Laura] and

64

[Hannah] and that such has had an adverse impact on [Laura]." In support of this finding, the chancery court quoted from Rainey's counseling notes as follows:

> In Exhibit 17 at page 84 [Laura] reported to Ms. Rainey on January 15, 2016, that she hated Greg because her mom "told her all the horrible things [about] her dad and she believed her mom. I then asked if her mom was the reason she acted the way she did toward her dad and she said "yes"; I attempted to talk to [Laura] [about] being able to have a good relationship with both of her parents. She said "she couldn't do that." [Ms. Rainey wrote that] "[i]t is obvious that [Laura's] affliction [sic] to her father is based on her mom's opinions." Further at page 87 of the same exhibit, Ms. Rainey instructed Kim [to] "stop telling/talking to [Laura] [about] her father negatively [and] encourage a relationship with him."

> The Court finds this evidence compelling and contrary to that offered by Kim at trial.

¶140. The chancery court also found "credible the testimony of both Counselors Rainey and Carr that [Laura] imitates her mother's negative attitudes toward Greg and, in Ms. Rainey's words, is 'learned behavior.' Ms. Carr also testified that her concern about the emotional effect on [Laura] is how such may impact [Hannah] in both parents' homes."

¶141. The record also reflects that both Kim and her father instructed the girls to call 911 on their cell phones if they felt scared or afraid while they were with Greg. The chancery court found that "[s]uch instruction is a suggestion for disobedience and defiance to a child by one parent against the other." Further, as supported by the testimony of both Rainey and Carr, the chancery court found that "[Laura] acts out when she does not get her way and that Kim's parenting style allows such while Greg's parenting style does not."

¶142. The chancery court further found from the preponderance of the credible evidence that

65

Kim's failure to recognize and support Greg's parental relationship with [Laura]; Kim's acquiescence in allowing [Laura] to determine if the child would spend custody and visitation time with Greg; the alienation and animosity allowed and fostered by Kim for [Laura] against Greg; and Kim's upset of court-ordered family counseling rises to the level of intentional interference and further constitutes a material change in circumstances.

Continuing, the chancery court found that "it is clear to the court that Kim has made [Laura] aware of her disdain for Greg and her indifference to Greg's parental rights with respect to both girls and that Kim has fostered such an attitude in [Laura]." In particular,

Kim has sanctioned [Laura's] animosity and antipathy and acting out toward Greg and alienated the child from him as her father. Moreover, Kim has ignored and disregarded her joint legal custody obligations under law owed to Greg as well as the Courts orders to leave the children out of disagreements and proceedings between she and Greg. . . . Two more abuse complaints against Greg brought since the February 7, 2017 hearing and ruling have again been unsubstantiated and unfounded. . . . These changes have clearly been adverse to the children's best interests per the testimony of Ms. Rainey, Ms. Carr and Greg.

¶143. Based upon our own review of the record, and our limited, deferential standard of review with respect to these findings, we find no manifest error in the chancery court's finding that "credible evidence, and inferences reasonably drawn from the evidence, supports these determinations therefrom." In addition to the evidence delineated above, this evidence also includes, for example:

Carr's testimony that Kim never said anything positive about Greg in any of the family counseling sessions thus far, and her testimony regarding Kim's "overwrought" relationship with Laura and Hannah (particularly Laura) and it being an obstacle to Laura's relationship with Greg;

Dr. Datz's findings in Kim's psychological report that "there are pieces of data [she has reviewed in preparing Kim's report] that suggest that personality or

66

at least boundary issues may be present," including, among others, "egregious behaviors of taping of a confidential psychotherapy session/exposing confidential information . . . a tendency toward self-serving/victimhood explanations, . . . voicing concerns about the divorce with the children, and attempting to use children to report back to her about her husband's behavior." Dr. Datz observed that these behaviors "would be considered at best as poor judgment, and at worst as indicative of maladaptive, long-standing personality characteristics;" and

Greg's testimony regarding Kim's involvement and interference with his visitation rights and his relationship with Laura, in particular, as delineated in prior orders of the chancery described above.

¶144. The chancery court also found "that Kim has effectively coached [Laura] against Greg when he attempts to parent his children during his visitation and custody times." In support, the chancery court found that "Kim has told [Laura] to tell Greg that she does not want to visit with him and wants to stay with her. This occurred on a least one exchange after Thanksgiving 2017." In the chancery court's view, "such a suggestion . . . on Kim's part . . . further underscore[s] her interference." Greg's testimony at trial also supports that Kim "has . . . encouraged Greg to forcefully remove [Laura] from her vehicle at exchange which would necessarily also occur in [Hannah's] presence." The chancery court found "from the preponderance of the credible evidence that this kind of 'parenting' is negative, counter-productive, and calculated on Kim's part to deny and/or interfere with Greg's visitation, custody, and parental rights as the noncustodial parent." Additionally, the chancery court found that "[t]he evidence establishes that Counselor Carr has concerns about emotional issues for [Laura] and the impact of such on [Hannah] in both parents' homes. Kim's upset of family counseling is detrimental to the entire family." Based upon our own

67

review of the record and our deferential standard of review, we find no manifest error in these determinations.

¶145. Further, the chancery court found that "[s]ince the last unfounded abuse or neglect reports, Kim has been complicit in [Laura] reporting abuse to her teacher and to her doctor. Again, these reports have been unsubstantiated and unfounded by DHS and/or CPS. (Exhibit 3 at trial)." We recognize, as Kim asserts, that there is no evidence that she directly made any of the abuse reports to DHS/CPS. However, we give "substantial deference" to the chancery court's "conclusions regarding witness credibility and what weight and worth to assign to the testimony of the various witnesses." *Durham*, 94 So. 3d at 356 (¶16). This determination was made based upon the chancery court's thorough and detailed analysis of the totality of the circumstances before it, including the evidence and testimony addressed above. We find no manifest error in the chancery court's determination on this point. Indeed, the children's GAL, Cynthia Re, also observed in her testimony that "while Kim is not the direct reporter of the DHS allegations, it certainly would appear that . . . the allegations have been initiated by persons with whom she has been affiliated such as the teachers, the most recent one. And the timing of those allegations have been typically when the Court was getting ready to make another ruling."

¶146. Regarding the temporary joint-custody arrangement that had been in place since July 2017, the chancery court found that it was not working in the children's best interest:

> Temporary week to week custody has not resolved the ongoing conflicts between Kim and Greg and Greg and [Laura] nor resolved the negative

68

influence of Kim on [Laura] concerning Greg and the best interests of both girls. The Court finds that the current temporary custody arrangement of week to week is not working for the best interests of the children.

¶147. The chancery court also included in its final judgment its specific finding with respect to Kim's testimony at trial:

[T]he Court finds Kim's testimony at trial that she has changed her mind and her attitude toward Greg and his parental rights to be unbelievable. The overwhelming evidence in this case says otherwise. Likewise, her testimony that the current week to week temporary custody order is working well is not supported by the weight of the credible evidence.

¶148. In her appellant's brief Kim asserts that the chancery court has erred in making these findings because they are not accurate or supported by substantial credible evidence. She takes issue with the chancery court's statement that it found her own testimony on particular issues "unbelievable." Kim asserts that not only did she testify on these issues, but "she also elicited credible testimony from [Greg, Carr, Rainey, Tripp, Laura's teachers, her father and her new husband that] corroborated all and/or parts of her testimony . . . . She also had numerous exhibits admitted into evidence which further corroborate all and/or parts of her testimony." Kim further asserts that the chancery court's findings cannot constitute a material change in circumstances adverse to the children or that posed a genuine danger to the children. In support of this assertion, Kim relies on her own testimony, Carr's testimony, her father's testimony, and Greg's testimony, indicating that Greg's relationship with Laura was strained from the start, and testimony from DHS/CPS investigator Gabrielle Tripp that there is no evidence that the girls were in physical danger at her (Kim's) home.

¶149. Kim's challenges to the chancery court's child-custody modification findings are based upon the chancery court's evidentiary and credibility assessments. However, in our role as the appellate court, "[w]e consider the entire record before us and accept all those facts and reasonable inferences therefrom which support the chancellor's findings. . . . The chancellor sits as fact-finder and his conclusions regarding witness credibility and what weight and worth to assign to the testimony of the various witnesses are entitled to substantial deference." *Durham*, 94 So. 3d at 356 (¶16) (citations and internal quotation marks omitted). This is so "whether the fact be found expressly or by necessary implication, and whether the finding relates to an evidentiary fact or an ultimate fact." *Bredemeier*, 689 So. 2d at 775. The chancery court "has the ultimate discretion to weigh the evidence the way [it] sees fit in determining where the child's best interest lies." *O'Briant*, 99 So. 3d at 806 (¶19) (internal quotation marks omitted).

¶150. In this case, the chancery court's judgment clearly shows that in making all of its findings, it took into account the testimonies of Kim, her father, Kim's new husband, the teachers from Laura's school (and where Kim taught), as well as the full scope of the testimonies of Rainey and Carr and the other witnesses at trial. We find that without question the chancery court fulfilled its role. Under own narrow and deferential standard of review we find no manifest error in the chancery court's findings.

¶151. We also find that Kim misses the point in asserting that the chancery court's findings are not relevant because Greg and Laura's relationship was already strained. The chancery

court made its findings, as supported by the substantial credible evidence delineated above, based on Kim's post-divorce actions. The chancery court found that these actions *exacerbated and influenced* Laura's relationship with Greg, adversely affecting both children, and posed a "genuine danger" to their mental and emotional health and well-being. The chancery court made the specific finding that based upon its review of the totality of the circumstances such "misconduct and interference" on Kim's part could not be foreseeable by the parties when the judgment of divorce was entered on December 29, 2015. The chancery court further found that Kim's post-divorce conduct and the circumstances of this case were "'extraordinary' in the context of . . . *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1014 [(¶29)] (Miss. 2012)," in which the supreme court recognized that in the "extraordinary case[] . . . , interference with a non-custodial parent's visitation [will rise] to the level where it constitutes a material change in circumstances." *See Potter v. Greene*, 973 So. 2d 291, 293 (¶8) (Miss. Ct. App. 2008) (finding that the mother's "continued and obstinate interference" with the father's visitation rights, including abuse allegations "that have been totally unsubstantiated over time" and necessitated DHS investigations as well as clinical evaluations of the child, as well as "coaching" by the mother leading to such allegations, constituted "a material change of circumstances adverse to the minor child and continuing over a long and extended period of time while [the daughter] has been in [the] custody of her mother").

¶152. In sum, we give "substantial deference" to the chancery court's weight and credibility

71

determinations based upon our limited review we find substantial credible evidence supports the chancery court's findings that "material change[s] in circumstances have occurred in the custodial home since the most recent custody decree that adversely affect[] the child[ren]," *Powell*, 976 So. 2d at 361 (¶11); Kim's conduct poses a genuine "danger to the mental or emotional health of the child[ren]," *Sullivan*, 37 So. 3d at 708 (¶8); and that "modification is in the best interest of the child." *Powell*, 976 So. 2d at 361 (¶11). We now turn to a discussion of the chancery court's *Albright* analysis.

### IX. *Albright* Analysis (Assignments of Error 24 and 25)

¶153. Once the chancery court has "found a material change in circumstance detrimental to the [children's] best interest . . . the factors in *Albright v. Albright* ought to play a significant role in the chancellor's ultimate determination of a suitable custody arrangement." *McCracking v. McCracking*, 776 So. 2d 691, 694 (¶10) (Miss. Ct. App. 2000) (citation omitted). As addressed in the prior section, we find that the chancery court has properly made a "material change in circumstances" determination, and thus we now address the chancery court's *Albright* analysis. Kim asserts that the chancery court erred in failing to make "sufficient[ly] detailed findings of fact [regarding] . . . each applicable *Albright* factor" and in determining that it was in the children's best interest to modify custody and place their physical custody solely with Greg. We find these assertions are without merit for the reasons addressed below.

¶154. In all cases involving child custody, including modification, the polestar

72

consideration is the best interest and welfare of the child, [and] . . . [t]he *Albright* factors are a guide for chancellors in weighing the facts to determine the child's best interest." *Wilson v. Wilson*, 79 So. 3d 551, 566 (¶63) (Miss. Ct. App. 2012) (citation and internal quotation mark omitted). The *Albright* factors include the following:

> (1) the child's age, health, and sex; (2) which parent had the continuity of care before the separation; (3) which parent has the best parenting skills; (4) which parent has the willingness and capacity to provide the primary child care; (5) each parent's employment and its responsibilities; (6) each parent's physical and mental health and age; (7) the emotional ties between the child and each parent; (8) each parent's moral fitness; (9) the child's home, school, and community record; (10) the child's preference, if the child is over twelve years old; (11) the stability of the home environment; and (12) any other relevant equitable factor.

*Id.* at 566 (¶64).

¶155. Kim contends that the chancery court erred in failing to "thorough[ly]" discuss *Albright* "factor by factor." This contention is without merit. First, the chancery court devoted over twenty pages of its final judgment to its *Albright* findings and discussion. The court addressed every applicable *Albright* factor. In doing so the chancery court included the findings contained in the GAL's report as to each factor, as supplemented by her testimony at trial, and her recommendations, where applicable. The chancery court then stated, with particularity, its own findings with respect to each *Albright* factor.

¶156. Second, to the extent Kim's assertion is that the chancery court did not give proper weight to particular factors, her contention is likewise without merit. As the supreme court recognized in *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001), "the *Albright* factors . . .

73

are certainly not the equivalent of a mathematical formula." "[T]he factors are not meant to be weighed equally in every case . . . [and] the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Wilson*, 79 So. 3d at 566 (¶63) (citations and internal quotation mark omitted).

¶157. In this case, the chancery court found that factors three, five, six, nine (as to Hannah regarding the school element and as to both girls as to the community element), and eleven (as to the stability of the home environment element), weighed in Greg's favor. The chancery court found that factors one and nine (as to Laura regarding the school element) weighed in Kim's favor. The chancery court found that factors two, four, seven, eight, nine (as to the home element), ten, and eleven (as to the stability of employment element) were neutral. Further, the chancery court addressed other factors that it took into account in its *Albright* analysis that we will discuss below. Kim asserts that the chancery court erred in its analysis with respect to all of the *Albright* factors except for factor one (age, health, sex of the children), which the chancery court found favored her.

¶158. We now address the chancery court's analysis and application of the *Albright* factors and the overriding consideration of the best interest of the children.

*Factor 1: age, health, sex of the child*

¶159. As noted, Kim does not contest the chancery court's determination that this factor favors her.

*Factor 2: continuity of care*

74

¶160. The chancery court found that Kim had been granted sole physical custody of the children in the divorce, and since July 2017 the parties shared joint custody by agreement. The chancery court found that this factor was neutral based upon its finding that Kim has interfered with Greg's custody and visitation rights. In support of this decision, the chancery court cites *Story*, 7 So. 3d at 298-99 (¶¶21-22), a case in which the Court found manifest error in the chancery court's determination that the continuity-of-care element favored the mother, where the child had been in the mother's care for most of her life. But this was due to the mother's repeated interference with child's relationship with the father. The Court held that it was "neither logical nor proper to favor one of the parents, under an *Albright* factor, because of that parent's malfeasance. . . . Equity dictates that the chancellor should have at least found this factor to be neutral." *Id.* at 298-99 (¶21). Kim asserts that she did not interfere with Greg's relationship with Laura, but we find that the chancery court's finding to the contrary is supported by substantial credible evidence, as discussed above. We find no error in the chancery court's analysis of the continuity-of-care factor.

*Factor 3: parenting skills and willingness and capacity
to provide primary child care*

¶161. The chancery court found in Greg's favor on this factor, finding that the "Court finds that subjecting [Hannah] to a forensic medical examination is adverse and detrimental to her best interests as well as the same is to the best interests of [Laura]."[12] The chancery court

---

[12] In the course of investigating Laura's later-determined, unsubstantiated abuse allegations as reported by Dr. Lowe, both girls were subjected to full forensic medical

further found that "[a]ll CPS Reports received have found the abuse allegations against Greg, whether brought by Ms. Rainey, initially, Kim or [Laura], or the medical doctor (Dr. Lowe), or a teacher or counselor to be unsubstantiated." Additionally, the chancery court found that "some of the same allegations are made over again by [Laura] in concert with her mother, Kim, against Greg to new and different parties obligated under law to notify CPS." Kim asserts she was not complicit in filing the abuse allegations because she was not the one to report them. As we have addressed above, the chancery court's determination was made based upon the chancery court's thorough and detailed analysis of the totality of the circumstances before it. Under our deferential standard of review, we find no manifest error in the chancery court's determination on this point.

¶162. The chancery court further found in Greg's favor on this factor based upon "the evidence that Greg has schedules, routines, and discipline in his home that he applies to both [Laura] and [Hannah]." In contrast, the chancery court found that "[t]he evidence presented

---

examinations. The chancery court was particularly concerned about Hannah having to undergo one and questioned DHS investigator Chelsiah Butler about it. She testified that DHS did not recommend it and that she did not know why "[Kim] took [Hannah] to have one . . . it had to be either someone at the [Kids Hub] center or her [Kim's] own decision." Kim testified that she was told by "someone" at the Kids Hub that all children in the household underwent an exam. We find no manifest error in the chancery court's inferring that Kim "subjected" Hannah, in one way or another, to this invasive examination, particularly in the light of Kim's inability to shed any light on exactly why Hannah needed to undergo one or under what authority "someone" at the Kids Hub told her to have Hannah undergo one, and further, in the light of Carr's testimony that Laura appears to be repeating the same perceived instances of neglect or abuse, and Kim's own admission that Laura is untrustworthy about abuse or neglect claims relating to Greg.

76

by both counselors Carr and Rainey suggests that [Laura] acts out in her mother's home to get her way if necessary. Those counselors also testified that [Laura] imitates her mother's attitudes toward Greg and that such is 'learned behavior.'"

¶163. Kim asserts that the chancery court erred in concluding that this factor favored Greg over her and that it should have been weighed in her favor. In addition to her assertions regarding the CPS/DHS investigations, Kim also cites evidence of the strained relationship between Greg and Laura and testimony from DHS/CPS investigator Tripp that Laura stated in an interview that she did not feel safe in Greg's home and Hannah stated she felt "kind of safe."

¶164. We do not find that these assertions overcome the overriding principle that it is the chancery court's role to judge the weight and credibility of the evidence, and we are bound to give substantial deference to the chancery court's determinations. We find that the chancery court's analysis with respect to this factor, which takes into account the totality of the circumstances and is supported by our own review of the record, demonstrates that there is substantial credible evidence supporting its decision that this factor favors Greg.

*Factor 4: willingness and capacity to provide the primary child care*

¶165. The chancery court found that this factor is neutral because both parents have the willingness and capacity to provide primary child care. Kim asserts the chancery court erred in this finding. According to Kim, this factor favors her because of the strained relationship between Greg and Laura and her profession as a teacher that allows her more flexibility in

77

the summer. We find no error in the chancery court's determination as to this factor considering the substantial credible evidence of Kim's role in contributing to the strained relationship between Laura and Greg. *Story*, 7 So. 3d at 298-99 (¶¶21-22). Further, the record reflects that Greg's profession (in business with his mother) also allows him flexibility, Greg's mother is available to help him when needed, Greg has put the children in a YMCA program, and both parents have been able to take the children to school and pick them up after school. Kim's arguments as to this factor are without merit.

*Factor 5: employment of the parent and responsibilities of that employment*

¶166. The chancery court found that Greg has lived in the same residence and held the same job since the divorce. In contrast, Kim has changed teaching jobs and moved several times with the girls since the divorce. The Court found this factor favors Greg. Kim asserts that this factor favors her due to her flexible work schedule as a teacher and her father's availability to help her. The record also reflects, however, that Greg's job is flexible and that his mother is available to help him when needed. Under our deferential review, we find no manifest error in the chancery court's decision on this factor.

*Factor 6: physical and mental health and age of the parents*

¶167. The chancery court found this factor favored Greg, finding that "Kim has a hearing loss and has an indicated diagnosis [according to Dr. Datz's report]: Rule Out Personality Disorder, unspecified (F60.9), while Greg does not." The chancery court also noted that "[b]oth parents have a diagnosis of 'interpersonal problem related to psychosocial

circumstances (i.e., custody dispute) (Z65.9).'" Kim asserts that this factor favors her because Greg did not complete the anger management course as required under the divorce judgment. In her psychological report on Greg, however, Dr. Datz viewed Greg as a "low potential violence risk." We find no manifest error in the chancery court's determination on this factor.

*Factor 7: emotional ties of the parent and the child*

¶168. The chancery court found that this factor was neutral, relying on this Court's decision in *Story* as support for its determination on this factor, as follows:

> The Court finds that Kim's negative influence with [Laura] against Greg has been intentional, calculated, indifferent, and damaging to Greg's parental rights and to [Laura's] best interests. The Court finds that [Laura's] time away from Kim while both girls stayed with their grandparents lessened the negative influence of Kim on [Laura] and improved the relationship between [Laura] and Greg as well as that of both with [Hannah]. The GAL findings that Kim and [Laura's] relationship has now not just gone back to the way it was but is much worse is further compelling evidence of Kim's undue, negative, and adverse influence on the child. The Court is concerned as to if and when such adverse influence will begin to affect [Hannah] as well. . . . The Court finds this factor neutral at best [under *Story*, 7 So. 3d at 298-99 (¶¶21-22)]. The Court refuses to credit Kim with stronger emotional ties to the girls given her upset and interference with Greg's parental relationship with both daughters.

¶169. We acknowledge that the evidence is clear that Laura is closer to her mother than her father. However, as we have addressed above, based upon our own review of the record, we find that the chancery court's finding that Kim's influence on Laura has had a negative impact on both girls and on Laura's relationship with Greg is supported by substantial credible evidence. As such, we find no manifest error in the chancery court's reliance on

79

*Story* in finding that this factor favors neither party. *See Story*, 7 So. 3d at 298-99 (¶¶21-22).

*Factor 8: moral fitness of the parents*

¶170. The chancery court found that this factor was neutral, referencing the GAL's finding that neither party uses drugs and that although "Kim and [Laura] allege that Greg drinks alcohol to excess[,] . . . no such substantive proof has been presented." Kim asserts that this factor should favor her for various reasons, including that Greg does not take the children to church regularly, but she does, and that "Kim has never been investigated for child abuse or neglect but Greg has." Our own review of the record shows that the abuse allegations against Greg were unsubstantiated, and we find no manifest error in the chancery court's finding that this factor favored neither party.

*Factor 9: the home, school, and community record of the child*

¶171. As to the elements in this factor, the chancery court found "the school factor as to [Laura] favors Kim over Greg;" the school factor as to [Hannah] favors Greg over Kim;" "the home factor is neutral;" and "the community record factor favors Greg as to both girls given Kim's interference with and defeat of Shannon Rainey's efforts as the court-appointed Family Counselor." The chancery court found that "[s]uch destructive efforts set back Greg in his relationship with both daughters thus causing him to start over again with a new court appointed Family Counselor, Debra Carr."

¶172. Kim asserts that the school factor should be neutral regarding both children because both children are doing well at this time. The record reflects, however, that Greg is

responsible for Hannah's tuition at the 3-D school and her transportation, and thus we find no manifest error in the chancery court's determination on this element.

¶173. Kim asserts that the home element should favor her, relying, in part, on Laura and Greg's strained relationship to support this assertion. Under *Story*, 7 So. 3d at 298-99 (¶¶21-22), we find no manifest error in the chancery court's determination that this element was neutral, given the chancery court's findings with respect to Kim's role in exacerbating this condition as we have addressed above.

¶174. Kim also asserts that the community element favors her "based on her efforts to record the April 12, 2016 session in order to protect [Laura] and the trial court record from Shannon Rainey's misrepresentations and manipulations of the information she obtained from [Laura] during counseling sessions." The chancery court found that "Kim's assertions that Ms. Rainey is to blame for unethical practices or behavior against her is misplaced and rejected by the Court." Based on our own review of the record, including Rainey's counseling notes and recommendation regarding the 911 incident, the transcript of the April 12, 2016 counseling session from the recording Kim obtained by hiding a recorder in Laura's purse, and Rainey's deposition, we find that substantial credible evidence supports the chancery court's finding that Kim's assertion against Rainey is "misplaced." We further find that substantial credible evidence supports the chancery court's finding that Kim's recordings of the counseling sessions, particularly the April 12, 2016 session between Laura and Rainey, interfered with the progress made in counseling and played a key role in Rainey seeking

81

recusal. We find no manifest error in the chancery court's determinations as to each element of the home, school, and community record of the children *Albright* factor.

*Factor 10: the preference of the child at the age sufficient, by law, to express a preference*

¶175. The chancery court found, with respect to this factor, that although Laura (the only child old enough to express a preference) expressed a preference to live with Kim, "[h]aving considered Kim's efforts at interference with and destruction of the parent-child relationship between [Laura] and Greg, and citing again to *Story*, [7 So. 3d at 298-99 (¶¶21-22)], the Court finds this factor to be neutral. To do otherwise would reward Kim for her misconduct and interference." Kim asserts that given Laura's preference, this factor should have been found in her favor. This Court has recognized that the chancery court is "not bound by the election of a minor child," *Sheridan v. Cassidy*, 273 So. 3d 783, 788 (¶21) (Miss. Ct. App. 2018) (citation and internal quotation mark omitted), and the chancery court clearly identified the reason it declined to follow Laura's preference. *Id.* Under *Story*, 7 So. 3d at 298-99 (¶¶21-22), we find no manifest error in the chancery court's decision finding this factor neutral.

*Factor 11: stability of home and employment of each parent*

¶176. The chancery court found that the stability of the home element of this factor favored Greg, finding that "Kim has . . . remarried [and] [a]s indicated above, Kim has moved with the girls several times causing a change in school and home location while Greg has not. Greg's home environment has been the same and more stable than has been Kim's." The

82

chancery court found that the employment element of this factor was neutral due to the stable employment of both parties.

¶177. Kim does not find the court in error with respect to the employment element of this factor. However, Kim asserts that the chancery court erred in finding in Greg's favor on the home element of this factor. Citing *Jordan* and *Horn*, Kim asserts that she cannot be penalized with respect to this element when Greg was allowed to keep the marital home in the divorce. *Jordan v. Jordan*, 963 So. 2d 1235, 1242 (¶21) (Miss. Ct. App. 2007) ("We find it unfair to ask a spouse to leave the marital home and then use that factor to also deny him or her custody of the child."); *Horn v. Horn*, 909 So. 2d 1151, 1160 (¶32) (Miss. Ct. App. 2005) (same). These cases, however, were custody cases in the context of divorces, not custody modification cases as in this case, and thus we do not find them instructive. Kim had two years and the equity from the marriage to find permanent housing, and she does not account for the time when she was required to vacate the mobile home (thirty days after the divorce in December 2015) to the time when she moved to her current residence in "spring or summer of 2016." Further, the chancery court also found that Greg's home environment has been more stable than Kim's. Taking into consideration the totality of the circumstances, including, but not limited to, Greg's parenting skills as compared to the "overwrought" nature of Kim's relationship with the girls (as described by the current family counselor, Debra Carr, and as corroborated by Rainey's deposition testimony), we find no manifest error in the chancery court's determination on this factor.

83

*Other relevant factors*

¶178. The chancery court also expressed concern about Laura's increased aggression toward Hannah as described by Carr and found that it occurred while the girls were in "Kim's custody or otherwise under her care, supervision, or control." Kim asserts that this finding is in error because there is no evidence she condoned or caused Laura to bully Hannah. The chancery court, however, did not make this finding. The chancery court did not specifically attribute Laura's bullying of Hannah to Kim, but the court did find that it was "consistent with [the] latitude granted her by Kim as supported by the evidence indicating the different parenting approaches taken by Kim and Greg in their respective homes." The chancery court further found that "[t]here is no evidence from trial to suggest that Greg has done anything to allow either daughter to intimidate or bully the other. His parental discipline is not abuse." In its analysis, the chancery court also recognized the GAL's same concern about Laura's bullying Hannah. The chancery court found this factor favored Greg, and we find no manifest error in this determination.

¶179. Additionally, the chancery court accepted the recommendation of the GAL that the girls should not be separated, a recommendation supported by Carr's and Rainey's testimonies.

¶180. Lastly, the chancery court discussed cases in its final judgment in which custody modifications have been affirmed where a parent was found to have interfered with the non-custodial parent's visitation. *See Ash v. Ash*, 622 So. 2d 1264, 1266-67 (Miss. 1993);

*Jernigan v. Jernigan*, 830 So. 2d 651, 653-54 (¶¶5-6) (Miss. Ct. App. 2002) (affirming custody modification from mother to father where, among other things, the mother repeatedly interfered with the child's relationship with the father, including unsubstantiated sexual-abuse claims and the mother's failure to cooperate with the court's visitation order). The chancery court also observed that "[i]n the *Albright* analysis, neither the law nor principles of equity allow Kim to benefit from her own misconduct in this custody dispute between parents." *See Heisinger v. Riley*, 243 So. 3d 248, 257-58 (¶¶34-40) (Miss. Ct. App. 2018); *Strait v. Lorenz*, 155 So. 3d 197, 206-08 (¶¶37-48) (Miss. Ct. App. 2015) (affirming chancery court's finding that as "a matter of equity" *Albright* factors should not favor the father, when the father had interfered with and prevented visitation and communication between the mother and her daughter); *Story*, 7 So. 3d at 298-99 (¶¶21-22).

¶181. In the light of these authorities, the chancery court considered the "totality of the acts, conduct[,] and omissions of Kim during the extended period of time in this litigation as to her parental duties and obligations to both [Laura and Hannah]" and delineated the instances in which it found, from the preponderance of the evidence, that Kim interfered with Greg's visitation and his relationship with Laura and, by extension, with Hannah. These instances include Kim's outright or complicit denial of Greg's visitation with Laura; interference with Greg's relationships with both children, including, but not limited to, Kim suggesting to the girls that they call 911 if they felt scared while visiting Greg; secretly taping two family counseling sessions; and "subverting" the chancery court's orders for Greg's "parental rights,

85

custody time, and visitation with his daughters to the detriment of both daughters." Considering our limited scope of review and the chancery court's specific findings, which are supported by the record, we cannot say the court's finding as to this additional factor was manifestly wrong.

*Conclusion Regarding the Albright Factors and the Best Interest of the Children*

¶182. We find that the chancery court thoroughly analyzed and applied the facts of this case to the *Albright* factors and provided an explanation for its findings as to each factor, bearing in mind the "polestar consideration" to maintain the best interest and welfare of the children. *Wilson*, 79 So. 3d at 566 (¶63). For the reasons addressed above, and in light of our deferential standard of review with respect to this matter, we find no manifest error in the chancery court's award of "primary" physical custody of the girls to Greg and its grant of regular visitation to Kim, as set forth in the chancery court's final judgment.

## X. Kim's Surreptitious Recordings of Counseling Sessions with the First Court-Appointed Family Counselor

¶183. Kim asserts that the chancery court manifestly erred in finding her in contempt of its orders when she secretly recorded the April 12, 2016 counseling session between Rainey and Laura and when she recorded the counseling session she and Greg had with Rainey on March 26, 2016. Rainey testified that she did not know the sessions were being recorded, and Kim admitted that as to the April 12, 2016 session between Rainey and Laura, Kim hid a recorder in Laura's purse without Laura's knowledge.

¶184. We begin our discussion with an overview of the circumstances surrounding this

86

issue. The chancery court's "Order for Family Counseling with Shannon Rainey" originated from the 911 call Laura placed when she and Hannah were at Greg's house for visitation. After the call, Kim did not require Laura to go to visitation with Greg. Greg filed a motion for contempt due to Kim's non-compliance with court-ordered visitation. Shortly thereafter Kim filed a "Motion to Hold Visitation with Specific Child ([Laura]) in Abeyance." In this motion, Kim also requested that the chancery court to "appoint a special expert[] to determine when and if visitation should resume."

¶185. The chancery court held a hearing on these motions on March 2, 2016. As we have explained in more detail above, at the end of the hearing pursuant to Rule 706, with Rainey's agreement and the agreement of counsel, the chancery court ordered that Kim, Greg, and both minor children continue in family counseling with Rainey, the counselor who had been seeing Kim and the girls for nearly three years and had had sessions with Greg, individually and with Laura, since the divorce trial. At the hearing, Kim's counsel also suggested that "since [Rainey was at the hearing the court could] see if she could talk to [Laura about the 911 incident] and report back to the [c]ourt." The chancery court then ordered Rainey to also investigate "the circumstances and events surrounding the [911] call" and report to the chancery court her findings and recommendations. The chancery court memorialized this bench ruling in its "Order for Family Counseling" on entered March 14, 2016, and further ordered "all parties . . . to fully cooperate and participate in the counseling as directed by the counselor."

¶186. After receiving Rainey's report concerning the 911 circumstances, the chancery court entered its May 10, 2016 order in which it denied Kim's motion to hold Laura's visitation with Greg in abeyance and granted Greg's motion for contempt. The chancery court further ordered that family counseling continue with Rainey. This order also specifically provided:

> The Court again admonishes and orders the parties not to discuss the divorce litigation with the children, not to question the children about counseling, not to coach the children, and not to participate in or overhear telephone communications of the children with the other parent.

¶187. Less than two weeks later, after having received Rainey's report, Kim filed a motion to amend the chancery court's May 10, 2016 order, seeking to have Rainey removed as the court-appointed counselor. Kim asserted that Rainey's alleged "lack of professional objectivity had affected Ms. Rainey's professional judgment and lessened her effectiveness in attempting to aid these parties in reaching a resolution to the issues they are currently facing as a family." Kim admitted in her motion that she had recorded a March 26, 2016 session Kim and Greg had with Rainey, and Kim also admitted recording Laura's April 12, 2016 session with Rainey by placing a recorder in Laura's purse (unbeknownst to Laura). The transcripts from these recordings were attached to Kim's motion and were admitted as exhibits at trial.

¶188. Greg responded to that motion and also moved to strike Kim's pleading and sought Rule 11 sanctions against Kim's attorney. Greg also separately moved for sanctions against Kim, alleging that by recording the session between Laura and Rainey, Kim had interfered with the chancery court's order and, further, "breached the trust between the counselor and

88

the minor child as well as continued the destruction of the child's relationship with her father."

¶189. In her responses to these pleadings, Kim denied that her behavior interfered with the orders of the chancery court or that her actions violated federal or state law or HIPAA regulations. She justified hiding the recorder in Laura's purse and recording Laura's April 12, 2016 counseling session with Rainey as necessary to protect Laura, asserting that "the greatest protection that could be afforded to [Laura] is for this Court to be made aware of the fact that the court-appointed expert had misrepresented to the Court the actual circumstances involved in the 911 call made by [Laura]."

¶190. On June 27, 2016, the parties appeared before the chancery court, but ultimately the court did not rule on Greg's motion for contempt (at issue here). The chancery court began the hearing by furnishing counsel with May 27, 2016 letter he had received from Rainey seeking her recusal from this matter.[13] In that letter, Rainey explained that after having received Kim's motion, she felt compelled to recuse herself from any further counseling efforts with respect to the minor children or their parents. In Rainey's view, Kim had made a "mockery of the therapeutic process." She stated in her letter that in her professional opinion Kim had been a detriment to the process of reconciliation between Greg and the children, and Kim was not serious about helping the girls improve that relationship.

---

[13] Rainey's May 27, 2016 letter was admitted into evidence as Exhibit 6 to Rainey's trial deposition.

¶191. The chancery court "regretfully" accepted Rainey's recusal. In her deposition, Rainey testified that her recusal request was caused by Kim's behavior and that the recordings defeated the therapeutic process. Greg testified that when Rainey was the counselor, he believed that he was making real headway at improving his relationship with Laura. After Kim recorded the sessions and Rainey was no longer their counselor, this caused his relationship with Laura to go "back to zero," and they had to start again with the new court-appointed counselor, Debra Carr.

¶192. In its final judgment, the chancery court found Kim in contempt for recording the counseling sessions, as follows:

> The Court finds that the counseling sessions of March 26, 2016, and April 12, 2016, secretly recorded by Kim violate confidentiality of counselor and client as per Ms. Rainey's deposition testimony and that such intentionally interferes with the Court Order for Family Counseling. The Court finds that Kim's intent and purpose was to get Ms. Rainey removed thereby undermining the progress made and the Order of the Court. . . . The Court finds that Kim's desired effect in taping the counseling sessions was accomplished. . . . The Court finds such interference on Kim's part with Ms. Rainey as Family Counselor to be compelling evidence of Kim's mission and intent to interfere with Greg's parental rights to the detriment of the children and their father. . . .

> As to Greg's June 1, 2016 Motion [for Contempt], the Court finds . . . that Greg has established a prima facie case of civil contempt of court against Kim. The Court finds from the evidence presented that Kim failed to meet her required evidentiary burden to establish any defense that excuses her from [her] . . . violat[ion of] her court-ordered obligation to participate and cooperate with the family counseling ordered by the Court in the appointment Order for Ms. Rainey.

¶193. "This court reviews civil-contempt decisions for manifest error." *Gary v. Gary*, 84

90

So. 3d 836, 839 (¶14) (Miss. Ct. App. 2012). In proving civil contempt, "[t]he burden is on the movant to prove a prima facie case that the alleged contemnor has not complied with the judgment." James W. Shelson, *Mississippi Chancery Practice* § 35:19, Westlaw (database updated Sept. 2020). "Failure to comply with a court order is prima facie evidence of contempt." *Stallings v. Allen*, 201 So. 3d 500, 504 (¶14) (Miss. Ct. App. 2016). "[T]he burden is then upon the defendant to raise such defenses as he may have to show that he should not be held in contempt of court." Shelson, *supra*, § 35:19. We find no manifest error in the chancery court's contempt decision in this case.

¶194. Kim asserts that the chancery court committed "manifest error" by considering her recording of the March 26, 2016 counseling session that she and Greg had with Rainey because Greg only sought sanctions with respect to Kim recording the April 12, 2016 counseling session between Rainey and Laura. We reject Kim's assertion. Although the record does reflect that Greg's motion only concerned the April 12, 2016 counseling session, we find that it is clear from the chancery court's judgment that Kim's behavior in surreptitiously recording the April 12, 2016 counseling session between Rainey and Laura—and its resulting interference in the family counseling process—is the crux of the chancery court's decision to hold Kim in contempt. To the extent the chancery court also mentions the March 26, 2016 counseling session, we find that this is no more than harmless error, if that, and certainly not a basis for reversing the chancery court's contempt decision.

¶195. Kim also asserts that the chancery court manifestly erred in holding her in contempt

91

for her surreptitious recording of the April 12, 2016 counseling session between Rainey and Laura because "it is undisputed that neither the Court Order for Family Counseling nor any other order in this cause prohibited Kim from recording the April 12, 2016 session between Rainey and [Laura]." She contends that "[w]ithout an order the Chancellor cannot hold her in contempt."

¶196. In support of this contention, Kim recites the general principle that "no charge of contempt will be sustained where the final decree is insufficient to advise the party affected in clear and unequivocal language of that which he has been ordered to do." *Switzer v. Switzer*, 460 So. 2d 843, 846 (Miss. 1984). We find that this general principle is met in this case and that Kim's assertions are without merit.

¶197. Like the chancery court, we find "incredulous" Kim's assertion that she could secretly record Laura's counseling session with Rainey because no court order prohibited it, "given her education, her role as a teacher, and given that the Court has previously ordered that the children not be privy to the parental disputes in litigation." In its March 14, 2016 order, the chancery appointed Rainey for two plainly delineated purposes: (1) to continue counseling the family; and (2) to talk with Laura in a counseling setting to investigate the 911 circumstances and provide a report and recommendation to the chancery court. Indeed, *Kim's counsel* suggested that Rainey be asked to talk with Laura about the 911 call. The chancery court further ordered the parties "to fully cooperate and participate in the counseling [sessions]." In its May 10, 2016 order, the chancery court ordered that family

counseling was to continue with Rainey, and in this order the chancery court specifically warned the parties "not to discuss the divorce litigation with the children [and] not to question the children about counseling."

¶198. We find that substantial credible evidence supports the chancery court's finding that Kim's secret recording of Laura's counseling session with Rainey regarding the 911 incident violated both the explicit purposes of its March 14, 2016 order and the follow-up requirements in its May 10, 2016: Rainey recused herself from serving as the court-appointed family counselor as a result of Kim's recording and subsequent accusations, requiring that a new family counselor be appointed and "thereby undermining the progress made . . . toward improvement of Greg's relationship with both of his daughters, but particularly with [Laura]." Kim's conduct demonstrated a complete failure to "cooperate . . . in the counseling [sessions]," as ordered by the chancery court. Moreover, by secretly recording Laura's counseling session with Rainey and filing the transcript as a matter of public record, Kim went far beyond the chancery court's admonition "not to question the children about counseling" and interjected herself in the middle of that private session ordered by the chancery court.

¶199. Under these circumstances and in the light of the chancery court's explicit admonitions, we do not find that the chancery court was required to specifically state in its orders that Kim was prohibited from secretly recording a private counseling between Laura and Rainey. This is particularly true here because the chancery court ordered Rainey to talk

93

with Laura for the specific purpose of allowing Laura to talk about the 911 circumstances in a counseling environment rather than having to testify in open court. Even if Kim believed what she had done was justified because, as she testified, "[she was Laura's] mother," we agree with the chancery court that she could not do so "in the way she did, via a surreptitiously recording." We find Kim's assertions on this point wholly without merit.

¶200. Kim also asserts that her conduct did not violate various federal and state laws, or HIPAA regulations. Nowhere in her argument, however, does Kim cite authority for the proposition that this allows her to disregard the chancery court's orders in the manner found by the court, and we have found no such authority. We find that this is especially true here, where the orders Kim circumvented were those issued pursuant to the chancery court's authority as the ultimate protector of the children's best interests. The chancery court's contempt findings were supported by substantial credible evidence, and we find Kim's assertions in this regard without merit.

¶201. Kim also asserts that her behavior in hiding a recorder in her daughter's purse and taping her daughter's counseling session was done in Laura's best interest and in good faith. In our limited review, we defer to the chancery court's assessment of the situation based upon a totality of the circumstances and as supported in the record. As we have addressed above, the chancery court found "that Kim's intent and purpose was to get Ms. Rainey removed thereby undermining the progress made and the Order of the Court." Continuing, the chancery court found:

94

[Kim's] poor judgment in how to bring any conflict between her and Ms. Rainey to the attention of the Court bespeaks further her efforts to separate Greg from his children.

. . . .

The Court finds that Kim's desired effect in taping the counseling sessions was accomplished. Ms. Rainey applied to the court for recusal and dismissal as Court appointed Family Counselor at a time when progress was being made toward improvement of Greg's relationship with both of his daughters, but particularly with [Laura]. The Court finds such interference on Kim's part with Ms. Rainey as Family Counselor to be compelling evidence of Kim's mission and intent to interfere with Greg's parental rights to the detriment of the children and their father.

Substantial credible evidence supports these findings, and we find no manifest error in the chancery court's finding Kim in contempt of its orders based upon them.

## XI.    Attorney's Fees Pursuant to Section 93-5-24(9)(c)

¶202.  Kim asserts that the chancery court erred in awarding Greg attorney's fees under section 93-5-24(9)(c) because she (herself) "never made any complaints of abuse to CPS in regard to Greg" and because, according to Kim, there is no evidence that she "conspiratorially influenced or caused [Laura] or anyone else to make any false allegations of abuse against Greg."

¶203.  Under section 93-5-24(9)(c), a court may impose sanctions for false "allegations of family violence," as follows:

If the court finds that the allegations of domestic violence are completely unfounded, the chancery court shall order the alleging party to pay all court costs and reasonable attorney's fees incurred by the defending party in responding to such allegations.

¶204.  In this case, the chancery court awarded Greg attorney's fees and the witness and

deposition fees for Rainey's deposition as sanctions under this provision, finding as follows:

> Kim has again violated [Mississippi Code Annotated section] 93-5-24(9)(c) for causing or contributing to unfounded abuse charges and reports to be made against Greg by way of [Laura] imitating Kims attitudes and animosity toward Greg.
>
> . . . .
>
> The Court has not ruled upon Greg's request for fees associated with allegations pled by Kim in her Motion To Hold Visitation In Abeyance filed February 26, 2016 . . . . While the allegations of Greg's abuse and neglect presented by Kim at trial were not made directly by Kim, nonetheless, the Court finds that [Laura] made the allegations while in her mother's care, custody, and control while privy to court proceedings shared with her by Kim. The CPS report identifies those allegations as nearly identical to those previously reported by Kim to DHS/CPS. The Court again finds Kim to be complicit in the latest abuse allegations asserted against Greg through [Laura]. Those reports were from [Laura] to her teacher and to her doctor. This finding is supported by Shannon Rainey's deposition testimony about [Laura] being coached at times and imitating her mother's behavior and attitudes toward Greg as well as the child believing the horrible things her mother told her about her father and as documented in Ms. Rainey's records in evidence.

¶205. Considering our "substantial deference" to the chancery court's "conclusions regarding witness credibility and what weight and worth to assign to the testimony of the various witnesses," *Durham*, 94 So. 3d at 356 (¶16), we find no manifest error in the chancery court's finding that Kim was complicit in the abuse allegations Laura made. The chancery court's finding is supported by Rainey's testimony and counseling-session notes, as well as the GAL's testimony.

¶206. Further, as Greg points out in his appellant's brief, Kim used instances of Greg's alleged violence toward Laura (which were all found unsubstantiated) as bases for a number

96

of motions filed in the course of this litigation, including Kim's "Motion to Hold Visitation with Specific Child ([Laura]) in Abeyance" that the chancery court specifically noted in its ruling quoted above. This motion related to the 911 incident, and Kim requested affirmative relief from the chancery court, alleging "[t]hat on January 31, 2016, the minor child [(Laura)], in the custody of her Father, Greg Stewart, made a 911 phone call to Perry County Sheriff Department, as a result of a violent episode involving the Father with the child, [Laura], therein causing emotional turmoil." The chancery court denied Kim's motion for lack of proof and after receiving Rainey's recommendations with respect to the 911 incident.

¶207. On December 22, 2016, Kim filed a "Motion to Temporarily Suspend Visitation" in which she again accused Greg of abusing Laura. This lead to a two-day hearing. The chancery court denied Kim's motion, finding that there was no evidence of abuse.

¶208. Additionally, Kim presented two teachers from Laura's school (where Kim also taught) to testify at trial about Laura telling them her father had abused or neglected her. A CPS investigation was initiated with respect to these allegations. CPS investigator Gabrielle Tripp testified at trial that these allegations were found unsubstantiated. Her report reflecting that information was also entered into evidence.

¶209. For the reasons discussed above, we find no manifest error in the chancery court's awarding Greg attorney's fees under section 93-5-24(9)(c).

### XII. Greg's Separate Motion for Appellate Attorney's Fees

¶210. Greg has filed a "Motion for Appeal Fee" under Mississippi Rule of Appellate

Procedure 27(a), seeking an award of appellate attorney's fees in the amount of half of the chancery court's awards for contempt and attorney's fees. The chancellor's final judgment awarded Greg $8,469.11 for contempt and $5,330 in attorney's fees. Greg requests an award of half the total amount, or $6,899.55, if he prevails on appeal.

¶211. The Mississippi Supreme Court passed the motion for consideration with the merits of the appeal. "When a prevailing party requests attorneys' fees on appeal, 'typically, the Court awards attorney fees on appeal in an amount equal to half the amount awarded at trial.'" *Latham v. Latham*, 261 So. 3d 1110, 1115 (¶22) (Miss. 2019) (quoting *Huseth v. Huseth*, 135 So. 3d 846, 861 (¶47) (Miss. 2014)). In *Latham*, our Supreme Court held that Rule 27(a) requires "a party seeking attorneys' fees on appeal 'to file a motion in the Court, supported by affidavits and time records that establish the actual fees expended on appeal.'" *Latham*, 261 So. 3d at 1115 (¶22) (quoting *Hatfield v. Deer Haven Homeowners Ass'n Inc.*, 234 So. 3d 1269, 1277 (¶30) (Miss. 2017)).

¶212. Greg has failed to provide any supporting affidavits or time records, so this Court is unable to review the actual fees expended on appeal. Therefore, we deny Greg's motion for appellate attorney's fees without prejudice to Greg's ability to refile his request prior to the issuance of the mandate in a motion that complies with Rule 27(a) and the requirements of *Latham*. *Herrin v. Perkins*, 282 So. 3d 727, 734 (¶26) (Miss. Ct. App. 2019).

¶213. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**